IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

LYNN DOE, as Guardian ad Litem      )
for "ROBBY" and "TIMMY," minors,    )
ANN DOE, as Guardian ad Litem       )
for "ADAM," a minor, ELLEN DOE,     )
as Guardian ad Litem for            )
"DANNY," a minor, and CINDY         )
DOE, as Guardian ad Litem for       )
 "WYATT," a minor,                  )
                                    )
            Plaintiffs,             )
                                    )
      v.                            )      1:17CV183
                                    )
UNITED STATES OF AMERICA,           )
STEPHEN J. SICINSKI, KIM            )
MCBROOM, ANNETTE SKINNER            )
COLEMAN, EMILY MARSH,               )
JOHN/JANE DOE #1,                   )
JOHN/JANE DOE #2, and               )
JOHN/JANE DOE #3,                   )
                                    )
            Defendants.             )

## MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

Presently before this court is the Motion to Dismiss
Plaintiffs' Amended Complaint filed by Defendant United States
of America (the "Government"). (Doc. 40.) The Government has
filed a brief in support of its motion. (Doc. 41.) Plaintiffs
Lynn Doe, Ann Doe, Ellen Doe, and Cindy Doe (collectively,
"Plaintiffs") have filed a response in opposition, (Doc. 46),
and the Government has replied, (Doc. 49).

Also before this court is the Motion to Dismiss Plaintiffs'
Amended Complaint filed by Defendants Stephen J. Sicinski, Kim
McBroom, Annette Skinner Coleman, and Emily Marsh (collectively,
"Individual Defendants," and together with the Government,
"Defendants"). (Doc. 42.) The Individual Defendants have filed a
brief in support of their motion. (Doc. 43.) Plaintiffs have
responded in opposition, (Doc. 47), and the Individual
Defendants have replied, (Doc. 50). Defendants' Motion for a
Stay in Light of Lapse of Appropriations is also before this
court. (Doc. 48.) On March 14, 2019, this court heard oral
argument on both motions to dismiss. For the reasons stated
herein, the Government's Motion to Dismiss, (Doc. 40), will be
granted in part and denied in part. The Individual Defendants'
Motion to Dismiss, (Doc. 42), will be granted. And Defendants'
Motion for a Stay, (Doc. 48), will be denied as moot.

I.   **BACKGROUND**

Plaintiffs allege that Jose Nevarez ("Nevarez"), an
instructor at Department of Defense ("DoD") elementary schools
located on the Fort Bragg military installation in North
Carolina, sexually abused their children. (Amended Complaint
("Am. Compl.") (Doc. 39) ¶¶ 1, 2, 31.) Plaintiffs bring this
lawsuit alleging wrongful acts and omissions by the Defendants,
in violation of duties owed to Plaintiffs' children pursuant to

a federal statute, DoD regulations, and North Carolina common law. (E.g., id. ¶¶ 10, 13.)[1]

A.  **Parties**

Plaintiff Lynn Doe is the mother and Guardian ad Litem for minors "Robby" and "Timmy." (Id. ¶ 22.)[2] Plaintiff Ann Doe is the mother and Guardian ad Litem for minor "Adam." (Am. Compl. (Doc. 39) ¶ 23). Plaintiff Ellen Doe is the mother and Guardian ad Litem for minor "Danny." (Id. ¶ 24.) Plaintiff Cindy Doe is the mother and Guardian ad Litem for minor "Wyatt." (Id. ¶ 25.)

Defendant Sicinski is a colonel in the United States Army and was the Fort Bragg Garrison Commander during the relevant time. (Id. ¶ 27.) Defendant McBroom was the principal at Fort Bragg's Pope Elementary School ("Pope Elementary") beginning in the fall of 2011 and during the relevant time thereafter. (Id. ¶¶ 28, 94). Defendant Coleman was a counselor at Pope Elementary during the relevant time. (Id. ¶ 29.) Defendant Marsh was the Fort Bragg District Superintendent during the relevant time. (Id. ¶ 30.)

---

[1] Plaintiffs rely on numerous DoD Education Activity ("DoDEA") and United States Army regulations, protocols, policies, practices, and procedures, which the court will generally and collectively refer to as the "DoD regulations."

[2] Robby was born in 1999 and was a minor when Plaintiffs filed this lawsuit on March 3, 2017. (Id. ¶ 22; see Doc. 1.)

**B.   Factual Allegations**

The facts, viewed in the light most favorable to Plaintiffs, are as follows.

Plaintiffs do not allege when Nevarez was hired as an instruction at Fort Bragg's DoD-operated elementary schools. Whenever Defendants hired Nevarez to be a substitute teacher, teacher's aide, and paraprofessional educator ("parapro"), they allegedly did not conduct a thorough background check, in violation of DoD regulations. (Id. ¶¶ 47-48, 50.) The background check Defendants did conduct failed to obtain information from Nevarez's home jurisdiction of Puerto Rico. (Id. ¶ 50.) Plaintiffs allege that a more thorough background check would have revealed prior allegations of sexual abuse from 2006, (id. ¶¶ 46, 48), and that Defendant Marsh later "admitted that had the background check been completed Nevarez would not have been hired." (Id. ¶ 50.)[3] Because Defendants did not conduct a thorough background check, Defendants were allegedly required to subject Nevarez to line-of-sight supervision or video monitoring in accordance with DoD regulations, which Defendants did not do. (Id. ¶¶ 49, 51.)

---

[3] As will be explained hereinafter, the background check, according to Plaintiffs, was conducted by the FBI. Plaintiffs neither allege nor explain how the school might have been negligent in relying upon an FBI background check.

- 4 -

As a result, Plaintiffs allege that Nevarez sexually abused elementary school students from August 2010 through November 2012 at several Fort Bragg schools, including Pope Elementary. (See id. ¶ 38.)

### 1. Nevarez's Conduct at Pope Elementary

From 2010 until at least November 2011 and March 2012 at the latest, Nevarez was a substitute teacher and teacher's aide at Pope Elementary. (See id. ¶¶ 39, 121.) Robby, Timmy, Adam, Danny, and Wyatt (collectively, "Minor Plaintiffs") attended Pope Elementary during this time. (Id. ¶ 39.) Minor Plaintiff Robby is autistic, (id. ¶ 22), and Defendants assigned Nevarez to be Robby's parapro for the 2010-11 and 2011-12 academic years. (Id. ¶¶ 39, 44, 192.) During this time, Nevarez allegedly sexually abused Minor Plaintiffs in school classrooms and bathrooms during school hours. (See id. ¶¶ 40-41.)

In the spring of 2011, Danny became apprehensive about attending school and repeatedly stayed home. (See id. ¶¶ 57, 59.) Danny and his mother met with a social worker in June 2011. (See id. ¶ 58.) Danny's mother specifically asked the social worker if something occurring at school could be causing Danny's distress, which the social worker allegedly dismissed. (Id. ¶¶ 60-61.) Shortly thereafter, Danny's mother met with the then-Principal of Pope Elementary, Joel Grim, to discuss Danny's

newfound apprehension. (Id. ¶ 64.) Plaintiffs allege that neither the social worker nor Principal Grim fully investigated Danny's change in behavior. (Id. ¶¶ 62, 65, 68.) Had they, Plaintiffs contend, they would have identified signs of sexual abuse. (Id. ¶ 68.)

In September 2011, Nevarez allegedly sexually molested two unidentified Pope Elementary students. (See id. ¶ 55.)[4] On October 11, 2011, Adam began crying and told his mother that Nevarez made Adam sit on his lap and "stroked his inner thigh" during class. (Id. ¶¶ 72, 74.) Adam screamed and told his mother that he did not want to sit on Nevarez's lap anymore. (Id. ¶ 73.) Adam and his mother immediately met with Defendant Coleman, the school counselor at Pope Elementary. (Id. ¶¶ 78, 80.) Adam allegedly told Coleman that "Nevarez was touching him and making him sit on Nevarez's lap and that he did not want to attend school anymore because he was scared that Nevarez would be there and touch him again." (Id. ¶ 81.) Coleman allegedly dismissed Adam's claims, defended Nevarez, and suggested that Adam had initiated any contact with Nevarez. (Id. ¶¶ 82, 84.)

---

[4] Plaintiffs base these and other allegations on information gleaned from an investigation report prepared during a criminal investigation of Nevarez (the "Investigation Report"). Plaintiffs apparently have a redacted version of the Investigation Report. (See Pls.' Opp'n to United States' Mot. to Dismiss ("Pls.' Opp'n Br.") (Doc. 46) at 15 n.3.)

Adam's mom responded that "Adam was not responsible for Nevarez sexually abusing him." (Id. ¶ 86.) Coleman then asserted that Defendants took allegations of child abuse seriously, and she promised to report Adam's disclosure and make sure that it was investigated. (Id. ¶ 89.)

Plaintiffs allege, upon information and belief, that Coleman informed Defendant McBroom, Pope Elementary's Principal, of Adam's disclosure. (Id. ¶ 94.) Plaintiffs allege that neither Coleman nor McBroom investigated Adam's claim or reported Adam's disclosure to their supervisors or the local United States Army Family Advocacy Program ("FAP") officer as they were required to under the DoD regulations. (Id. ¶¶ 94, 95, 106, 113, 231.) Instead, "[s]oon after" Adam's disclosure, Defendant Coleman allegedly told Nevarez about it. (Id. ¶ 97). Nevarez then returned to his classroom, told Adam about his conversation with Coleman, and proceeded to sexually abuse Adam by "strok[ing] Adam's penis and anus underneath his clothing" while Adam sat on Nevarez's lap. (Id. ¶¶ 98-102.) Defendant McBroom allegedly assigned Nevarez to Pope Elementary classrooms on at least seventeen days in the two months following Adam's disclosure, including to Adam's and other Minor Plaintiffs' classrooms, where Nevarez allegedly abused them. (Id. ¶ 110.)

On November 8, 2011, Wyatt resisted attending school and told his mother that Nevarez was inappropriately touching him and other students. (See id. ¶¶ 118-19.) Wyatt's mother informed her husband, who reported Wyatt's disclosure to the Fort Bragg Military Police that same day. (Id. ¶ 120.) Wyatt's parents met with Defendants McBroom and Coleman shortly thereafter. (Id. ¶ 123.) Coleman denied that Nevarez had sexually abused students or that he would do so. (Id. ¶¶ 124-25.) McBroom informed Wyatt's parents that Defendants followed protocol after becoming aware of Nevarez's sexual abuse. (Id. ¶ 126.) McBroom offered no assistance in providing Wyatt with counseling or treatment. (See id. ¶ 128.) Plaintiffs allege that neither Coleman nor McBroom reported Wyatt's disclosure in accordance with DoD regulations. (Id. ¶ 129.) On or around November 8, 2011, Defendants "removed Nevarez from the classroom," but did not remove him from the base. (See id. ¶ 121.)[5]

---

[5] The Complaint contains contrary allegations that Defendants assigned Nevarez to the classroom for two months after learning of Adam's disclosure on October 11, 2011, (Am. Compl. (Doc. 39) ¶ 110), and that Defendants removed Nevarez from the classroom on or around November 8, 2011, (see id. ¶ 121; see also id. ¶ 179 ("In truth and in fact, the Defendants waited almost a month after the initial report before dismissing Nevarez and another four months before barring him from the base.")). At this juncture, the court construes the facts in the light most favorable to Plaintiffs.

On January 6, 2012, Plaintiffs allege that Defendants received another report of child abuse by Nevarez, (Id. ¶ 143), yet, allege no other details about this report except that Defendants failed to adequately respond to it. (See id. ¶¶ 143-44.)

In early 2012, Danny told his mother that Nevarez made Danny sit on his lap while in class and would "rub [Danny's] back, butt, and thighs, and put his hands inside Danny's pants." (Id. ¶¶ 147-48.) While doing so, Danny "would feel something hard poking from Nevarez's pants." (Id. ¶ 149.) Danny's mother reported Danny's disclosure to a Criminal Investigation Command agent, who was apparently working with the FBI to investigate Nevarez at the time. (See id. ¶¶ 134, 150, 155.) The agent allegedly told Danny's mother to keep the sexual abuse allegations quiet, (id. ¶ 156), and Danny's mother threatened to go to the media. (Id. ¶ 157.) Plaintiffs allege that Defendants retaliated against Danny's family for this threat by transferring Danny's father to a "low-level" and "menial desk job far away from Fort Bragg."[6] (Id. ¶¶ 258-60.)

---

[6] Plaintiffs similarly allege that Defendants later denied Adam's stepfather's application for compassionate reassignment without explanation and involuntary separated him from the Army, which led to the loss of the family's medical insurance and discontinuation of Adam's treatment and counseling. (Id. ¶¶ 281-87.)

On February 21, 2012, Plaintiffs Ann and Ellen Doe met with Defendant McBroom to seek information on Defendants' supposed investigation of Nevarez (it is unclear whether Plaintiffs refer here to the criminal investigation or a separate internal investigation). (See id. ¶¶ 158-59.) McBroom allegedly told them it was the first she had heard of any sexual abuse allegations against Nevarez, yet Plaintiffs also allege that McBroom declined to comment further due to an ongoing investigation. (See id. ¶¶ 162-63.)

On February 23, 2012, Adam's father informed his commanding officer of Nevarez's abuse, and he referred Adam's father to a social worker at Womack Army Medical Center. (Id. ¶ 165.) Plaintiffs Ann and Ellen Doe then met with that social worker and disclosed Nevarez's abuse of their sons. (Id. ¶ 166.) The social worker allegedly "blamed the victims" for the abuse and accused Adam's mother of having a "vendetta against Coleman." (Id. ¶¶ 167-68.) The social worker nonetheless said that she would investigate the matter but did not provide any treatment information, which Plaintiffs allege she was legally obligated to do. (Id. ¶ 169-70.)

In early March 2012, Defendants held a meeting for the parents of those children allegedly abused by Nevarez, which Adam's and Wyatt's parents attended. (Id. ¶ 172.) The

unidentified government representatives at the meeting asserted that they first learned of Nevarez's abuse from Wyatt's mother in November 2011. (Id. ¶ 174.) Adam's mother told the representatives that she had reported Adam's abuse in October 2011. (Id.) On March 13, 2012, Defendants sent a letter to parents regarding Nevarez's abuse. (Id. ¶¶ 177-78.) The letter stated that school officials stopped calling Nevarez to substitute "[i]immediately upon notification of the initial allegation." (Id. ¶¶ 177-78.) Plaintiffs allege that Defendants in fact waited "almost a month [until November 2011] after the initial report [in October 2011] before dismissing Nevarez and another four months [until March 2012] before barring him from the base." (Id. ¶ 179). That delay, Plaintiffs continue, "enabled Nevarez to continue to abuse children . . . on the base," (id. ¶ 180), and "undermined the investigation and the requirement to provide prompt and comprehensive assessment and treatment." (Id. ¶ 181.)

Prior to a March 16, 2012 town hall meeting at Pope Elementary, Defendants allegedly "notified Robby's parents of Nevarez's sexual crimes against their son." (Id. ¶ 197.) Plaintiffs allege that Defendants assigned Nevarez to work with Robby after they were notified of Nevarez's abuse. (Id.) Plaintiffs allege that Nevarez took advantage of his position as

Robby's parapro to "continuously and repeatedly stroke and rub Robby's penis, back, thighs, legs, and other parts of his body." (Id. ¶ 194.) Plaintiffs do not specifically allege when Nevarez abused Robby.

Defendants Sicinski and Marsh attended the March 16, 2012 town hall meeting at Pope Elementary. (Id. ¶ 184.) Sicinski "admitted that a November 8, 2011 report on Nevarez's sexual abuse of children sat on his desk for three months without being read." (Id. ¶ 186.) Parents were told that they should contact Womack Army Medical Center's Office of Social Work if they were concerned that their child might have been sexually abused. (Id. ¶ 188.)

In or after mid-March 2012, one of Danny's classmates informed his mother that he "had witnessed the sexual abuse of Danny and other students." (See id. ¶ 203.) Plaintiffs allege that "[s]everal children interviewed during [an] investigation stated that they observed Nevarez either following or pulling boys into the school bathroom." (Id. ¶ 206.) Plaintiffs allege that Defendants McBroom and Coleman knew that other teachers allowed Nevarez's conduct. (Id. ¶ 207.)

On March 23, 2012, Defendants notified parents at all Fort Bragg schools where Nevarez had previously taught that there was an ongoing investigation into allegations of sexual abuse by "an

unnamed substitute teacher." (<u>Id.</u> ¶ 208.) Defendant Sicinski signed the letter, which contained commitments regarding treatment, care, and counseling for victims. (<u>Id.</u> ¶ 209.)

On March 28, 2012, Defendants conducted an After Action Review ("AAR") of their handling of the allegations against Nevarez, the findings of which were documented in a May 3, 2012 memorandum (the "AAR Memo") prepared by Defendant Sicinski. (<u>Id.</u> ¶¶ 211-12.) The AAR Memo detailed Defendants' numerous shortcomings, many in violation of DoD regulations. (<u>See, e.g.</u>, <u>id.</u> ¶¶ 215-16, 218, 222.) The AAR Memo identified a "reporting breakdown" on November 8, 2011 as "the primary cause of the installations' [sic] failure." (<u>Id.</u> ¶ 219 (quoting the AAR Memo at 2).)

On May 18, 2012, Defendants held a meeting for the sixteen families affected by Nevarez's actions. (<u>See</u> Am. Compl. (Doc. 39) ¶¶ 224, 229.) At that meeting, Defendant Sicinski, who left his post at Fort Bragg shortly thereafter, (<u>id.</u> ¶¶ 234-35), "acknowledged the widespread sexual abuse of children and regretted that the abuse occurred." (<u>Id.</u> ¶ 229.) The Defendants also allegedly acknowledged several of their shortcomings in preventing the sexual abuse, including insufficient monitoring of teachers and insufficient training on sexual abuse reporting and identification. (<u>See</u> <u>id.</u> ¶ 230.) During that meeting, a

Government representative "addressed Counselor Coleman's failure to respond to the October 2011 report of Adam's sexual abuse." (Id. ¶ 231.) He allegedly said that DoD school policy "requires school personnel not to make a judgment about the level of abuse or whether there is abuse, but that they must report up the chain of command any indication or hint of child sexual abuse." (Id.)

In mid-2013, Timmy allegedly disclosed that Nevarez had abused him by stroking Timmy's body while he sat on Nevarez's lap. (See id. ¶¶ 265, 267.) A therapist evaluated Timmy and concluded he had been sexually abused by Nevarez. (Id. ¶ 272.) Timmy's mother contacted a social worker who advised her that "the Nevarez investigation was 'closed' and that Timmy should get counseling if there were any issues." (Id. ¶¶ 273-74, 278-79.) Plaintiffs do not specifically allege when Nevarez abused Timmy.

Plaintiffs assert that Defendants did not provide or authorize treatment for Minor Plaintiffs, including Robby, until months after Wyatt's disclosure in November 2011 and delayed in providing medical records and never provided other promised records. (Am. Compl. (Doc. 39) ¶¶ 239, 241-43, 248-51.)

### 2. The Investigation Report & Nevarez's Conduct at Other Schools

In late 2011, Defendants initiated a criminal investigation, which Plaintiffs assert did not result in charges against Nevarez. (Id. ¶¶ 131, 133.) Plaintiffs claim that the investigation "was intended more to shield the Defendants from civil liability than to prosecute [Nevarez]." (Id. ¶ 131.) The Plaintiffs met and communicated with the agent in charge of the criminal investigation in November 2011 and December 2011 and were allegedly told to keep quiet about the investigation and Nevarez's abuse. (See Id. ¶¶ 134-39.) As part of the investigation, Wyatt and Adam were interviewed at the Child Advocacy Center in late 2011. (Id. ¶ 140.) Yet, a social worker allegedly did not review Wyatt's interview and did not contact Wyatt's mother until March 2012. (See id. ¶ 171.) Plaintiffs allege the criminal investigation took over two years, that Defendants did not seek to indict Nevarez, refused to offer Plaintiffs an explanation for not doing so, and that the "United States Attorney's Office intentionally failed to conduct a thorough, professional investigation . . . ." (Id. ¶¶ 290-92.) Plaintiffs further allege that Defendants failed to confer with victims' parents about an ongoing criminal investigation in violation of 18 U.S.C. § 3771. (Id. ¶ 293.)

Plaintiffs allege several facts gathered from the Investigation Report concerning Nevarez's conduct at other schools. In 2006, Nevarez was accused of similar sexual abuse while working at Hoke County High School in North Carolina. (See id. ¶ 46.) In January or February 2011, Nevarez "'hugged students, targeted kids with disabilities, [and] stared at girl's [sic] behinds'" at Fort Bragg's Irwin Elementary School. (Id. ¶ 52.) Based on these facts, Plaintiffs allege that Defendants "knew about Nevarez's sexual abuse . . . as early as January or February 2011, when an Irwin school student reported [Nevarez's] inappropriate behavior to the school teacher and principal." (Id. ¶ 221.) A Fort Bragg student also reported at an unalleged time that Nevarez pulled kids into bathrooms, touched their butts and penises, and set students on his lap. (Id. ¶ 54.) Plaintiffs allege that the student told his teacher and principal about this conduct, but that they, along with other school employees, failed to report these incidents to officials at the time they occurred, in violation of federal and state law and DoD regulations. (Id. ¶¶ 52-54.)

### 3. Defendants' Alleged Duties

Plaintiffs allege that Defendants voluntarily assumed several duties and were subject to others imposed by the DoD

regulations and a federal statute, 42 U.S.C. § 13031.[7] (Am.
Compl. (Doc. 39) ¶ 37.) Specifically, Plaintiffs allege that
Defendants had a duty to prevent and protect students from
sexual abuse, (id. ¶ 37.A); a duty to report child sexual abuse,
(id. ¶ 37.B); a duty to identify, investigate, and treat victims
of child sexual abuse, (id. ¶ 37.C); and a duty to conduct
background checks and train employees about child sexual abuse,
(id. ¶ 37.D).

Plaintiffs allege that, if Defendants had conducted a
thorough background check or subjected Nevarez to line-of-sight
supervision, the sexual abuse would not have occurred. (Id.
¶ 51.) Plaintiffs also allege that school officials failed to
adequately train school personnel in violation of DoD
regulations, (id. ¶ 232), and that the Government "failed to
provide education programs to children of Fort Bragg schools,
including [Minor Plaintiffs], on understanding and acting to
prevent themselves from sexual abuse." (Id. ¶ 234.) Plaintiffs
also allege that Defendants breached their duty, as promised to
Plaintiffs in the March 23, 2012 letter, to provide treatment,
care and counseling to victims. (Id. ¶¶ 209, 238.) Plaintiffs
generally allege that Defendants' breaches of these duties owed

_____

[7] 42 U.S.C. § 13031 has since been transferred to 34 U.S.C.
§ 20341, which the court will cite.

to Minor Plaintiffs proximately caused Minor Plaintiffs'
injuries, including symptoms of severe sexual abuse. (Id. ¶¶ 14,
43.)

## C.    Claims for Relief

Plaintiffs allege ten claims for relief, six against the
Government and four against the Individual Defendants.
Plaintiffs allege that the Government is generally liable to
them under the Federal Tort Claims Act ("FTCA") and North
Carolina law. (Id. at 53.) In Claim I, Plaintiffs allege that
the Government breached its alleged duty to protect from,
investigate, and remediate Nevarez's sexual abuse given a
reasonably foreseeable risk. (Id. ¶¶ 298-04.) In Claims II-IV,
Plaintiffs allege common law negligence against the Government
for failure to protect, report, investigate, and provide
treatment under three theories: a voluntarily assumed duty
(Claim II), a special duty (Claim III), and a duty arising out
of a special relationship (Claim IV). (Id. ¶¶ 305-32.) In Claim
V, Plaintiffs allege negligence per se and, in Claim VI,
Plaintiffs bring a premises liability claim. (Id. ¶¶ 333-49.)

Plaintiffs allege that the Individual Defendants are liable
to them for violating their Fifth Amendment substantive due
process right to bodily integrity. (See ¶¶ 358, 371, 379, 387.)
Claims VII-X are Bivens claims, under theories of danger

creation, (id. ¶¶ 357-69 (Claim VII)); failure to screen or

supervise, (id. ¶¶ 370-77 (Claim VIII)); failure to terminate,

(id. ¶¶ 378-85 (Claim IX)); and failure to train, (id. ¶¶ 386-92

(Claim X)).

## II.  THE GOVERNMENT'S MOTION TO DISMISS

The Government has moved to dismiss Claims I-VI pursuant to

Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (Doc.

40.) The Government contends that this court lacks subject

matter jurisdiction over Claims I-VI because the FTCA's

intentional torts exception bars those claims. See 28 U.S.C.

§ 2680(h); (United States' Br. in Supp. of Mot. to Dismiss

("Gov't Br.") (Doc. 41) at 1)[8]. Alternatively, the Government

contends that, even if this court has jurisdiction, Plaintiffs

fail to state a claim upon which relief can be granted because

the Government only owed Minor Plaintiffs a duty of ordinary

care to protect them from foreseeable harm, and Nevarez's abuse

was not reasonably foreseeable. (Id. at 24.)

### A.  12(b)(1) Legal Standard

Under Federal Rule of Civil Procedure 12(b)(1), a plaintiff

must prove by a preponderance of the evidence the existence of

---

[8] All citations in this Memorandum Opinion and Order to
documents filed with the court refer to the page numbers located
at the bottom right-hand corner of the documents as they appear
on CM/ECF.

subject matter jurisdiction. See Demetres v. E. W. Constr., Inc., 776 F.3d 271, 272 (4th Cir. 2015). A defendant may challenge subject matter jurisdiction factually or facially. See Kerns v. United States, 585 F.3d 187, 192 (4th Cir. 2009). Here, the Government facially challenges subject matter jurisdiction. (See Gov't Br. (Doc. 41) at 8.) In a facial challenge, a defendant asserts that the allegations, taken as true, are insufficient to establish subject matter jurisdiction. See Kerns, 585 F.3d at 192. The court then effectively affords a plaintiff "'the same procedural protection as he would receive under a Rule 12(b)(6) consideration," taking the facts as true and denying the Rule 12(b)(1) motion if the complaint "alleges sufficient facts to invoke subject matter jurisdiction." Id. (quoting Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982)).

**B.    12(b)(6) Legal Standard**

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible on its face if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable" and demonstrates "more than a sheer possibility that a

defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556-57). When ruling on a motion to dismiss, this court accepts the complaint's factual allegations as true. Iqbal, 556 U.S. at 678. Further, this court liberally construes "the complaint, including all reasonable inferences therefrom, . . . in plaintiff's favor." Estate of Williams-Moore v. All. One Receivables Mgmt., Inc., 335 F. Supp. 2d 636, 646 (M.D.N.C. 2004) (citation omitted). This court does not, however, accept legal conclusions as true, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.

## C.   The FTCA

As a sovereign, the United States and its agencies are immune from suit, absent a waiver of that immunity. F.D.I.C. v. Meyer, 510 U.S. 471, 475 (1994). A plaintiff bears the burden of demonstrating a waiver of that immunity and also that an exception to the waiver does not apply; if a plaintiff fails to meet that burden, then the court lacks subject matter jurisdiction and must dismiss the suit. See Welch v. United States, 409 F.3d 646, 651 (4th Cir. 2005).

Plaintiffs allege that this court has jurisdiction under the FTCA, which creates a limited waiver of the Government's sovereign immunity. In that regard, the FTCA is strictly

construed, and all ambiguities are resolved in favor of the

United States. Robb v. United States, 80 F.3d 884, 887 (4th Cir.

1996). The FTCA provides that:

> [T]he district courts . . . shall have exclusive
> jurisdiction of civil actions on claims against the
> United States, for money damages . . . for injury or
> loss of property, or personal injury or death caused
> by the negligent or wrongful act or omission of any
> employee of the Government while acting within the
> scope of his office or employment, under circumstances
> where the United States, if a private person, would be
> liable to the claimant in accordance with the law of
> the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1). The FTCA's waiver of immunity only

applies in negligence actions against the Government where the

Government, "if a private person, would be liable to the

claimant in accordance with the law of the place where the act

or omission occurred." 28 U.S.C. § 1346(b)(1).[9] Here, that law of

the place is North Carolina.

Even if a claim meets § 1346(b)(1)'s requirements, the

claim might be barred by an exception to the FTCA's waiver of

---

[9] The relevant "private person" inquiry is whether a
similarly-situated defendant would be liable under North
Carolina law. Here, the court analyzes whether Plaintiffs
plausibly establish liability under North Carolina law were Pope
Elementary owned by a private person and not located on a
federal military base. See Sheridan v. United States, 487 U.S.
392, 401 (1988) ("Sheridan I") ("The District Court and the
Court of Appeals both assumed that petitioners' version of the
facts would support recovery under Maryland law on a negligence
theory if the naval hospital had been owned and operated by a
private person.").

immunity. One of those exceptions, the intentional tort exception, provides that the FTCA's waiver of sovereign immunity does not apply to any claim arising out of assault or battery. 28 U.S.C. § 2680(h). Here, that means that, if Plaintiffs' claims against the Government arise out of Nevarez's sexual assault or battery of Minor Plaintiffs, then those claims are barred by the intentional tort exception.

To establish that their claims against the Government did not arise out of Nevarez's intentional torts, Plaintiffs must plausibly allege that the Government negligently breached a duty imposed upon it that was "entirely independent" of Nevarez's employment status and that the breach "allowed a foreseeable assault and battery to occur." Sheridan I, 487 U.S. at 401. Allegations of negligent supervision, however, will not establish FTCA liability "because the United States owes no general duty to the public to supervise its employees or agents with care." Sheridan v. United States, 969 F.2d 72, 75 (4th Cir. 1992) ("Sheridan II") (citation and internal quotation marks omitted); see also Sheridan I, 487 U.S. at 406 (Kennedy, J. concurring) ("To determine whether a claim arises from an intentional assault or battery and is therefore barred by the exception, a court must ascertain whether the alleged negligence was the breach of a duty to select or supervise the employee-

tortfeasor or the breach of some separate duty from the
employment relation.").

### D.    12(b)(1) Analysis

The Government argues first that the FTCA's intentional
torts exception bars Plaintiffs' claims against it, because the
claims reduce to negligent supervision claims precluded by
Sheridan II. (See Gov't Br. (Doc. 41) at 11-13.) Second, the
Government argues that that the Government owes no duty to
Plaintiffs under North Carolina law that is entirely independent
of Nevarez's employment. (See id. at 14-16.)

Plaintiffs argue that Government employees breached duties
entirely independent of Nevarez's employment status through
their own negligent acts and omissions, including those imposed
by North Carolina law. (See Pls.' Opp'n Br. (Doc. 46) at 7-8.)
Plaintiffs contend that the Complaint's negligent hiring,
supervision, and retention allegations are limited to the Bivens
claims against Individual Defendants. (See id. at 10.)
Plaintiffs also argue that "the mere existence of negligent
hiring, supervision, and retention" allegations does not
preclude FTCA claims grounded in independent duties. (Id.)

Both parties have meritorious 12(b)(1) arguments. The
Complaint is littered with negligent hiring, supervision, or
retention allegations supporting Plaintiffs' claims against the

Government, even if not styled as such, and those claims are barred by the intentional tort exception under Sheridan II. See 969 F.2d at 75. For example, Plaintiffs allege that the Government breached a duty to train personnel on how to prevent, identify, and treat child sexual abuse. (Am. Compl. (Doc. 39) ¶¶ 307, 315, 327, 335.) Contrary to Plaintiffs' assertion that the negligent hiring and supervision claims are limited to the Bivens claims, these allegations are explicitly contained in Plaintiffs' third, fourth, and fifth claims for relief against the Government. Further, the court agrees with the Government that Plaintiffs attempt to premise claims on the Government's failure to abide by the DoD regulations, "is simply to assert that [DoDEA] employees were not properly supervised." Sheridan II, 969 F.2d at 75; (see Gov't Br. (Doc. 41) at 15). In addition, these DoD regulations, by their very nature, do not apply to non-military families and personnel or a private person in North Carolina, let alone a school. See, e.g., LaFrancis v. United States, 66 F. Supp. 2d 335, 341 (D. Conn. 1999) ("[T]he services of the FAP were only available to Navy personnel and their immediate families; if the plaintiff had been married to a civilian, she would not have been eligible to participate in the

FAP.")[10] While the FTCA caselaw dictates that courts should look to similar or analogous state law duties as those imposed by federal regulations, see, e.g., Florida Auto Auction of Orlando, Inc. v. United States, 74 F.3d 498, 502 (4th Cir. 1996), Plaintiffs have only attempted to analogize these DoD regulations to an assumption of the duty claim under North Carolina law. (See Pls.' Opp'n Br. (Doc. 46) at 20.) But that theory of liability, i.e., relying on the gratuitous promulgation of Army regulations, was foreclosed by the Fourth Circuit's decision in Sheridan II. See 969 F.2d at 75 ("To

---

[10] To take but two examples, Plaintiffs argue that the duty to investigate sexual abuse imposed by the DoD regulations does not depend on the abuser's employment with the DoD. (See Pls.' Opp'n Br. (Doc. 46) at 14 (citing Rev. Reg. 608-18 ch. 1, § I, 1-6).) Even if the court agrees, Plaintiffs do not plausibly allege that a private person under North Carolina law has a duty to investigate and assess child abuse. In fact, the reporting regimes suggest to this court that private persons would not have such a duty. So too of the FAP's alleged requirements that Defendants treat child abuse. (See Am. Compl. (Doc. 39) ¶ 37.C.) Even if the court found that the DoD regulations created legally enforceable obligations owed by the Government, the court is unaware of any analogous duty to treat child abuse imposed upon a North Carolina school or its employees.

Further, many of the DoD regulations Plaintiffs rely upon merely recite policy statements. (See, e.g., id. ¶¶ 37.C-D.) This court doubts that analogous state policy statements could form the basis of any duty under North Carolina law. See McCants v. Nat'l Collegiate Athletic Ass'n, 201 F. Supp. 3d 732, 743 (M.D.N.C. 2016) ("It is well settled under North Carolina law that the adoption of rules, policies, and procedures . . . is insufficient as a matter of law to impose a legal duty based on the voluntary undertaking doctrine.").

premise a claim on failure to follow these regulations, with
nothing more, is simply to assert that naval employees were not
properly supervised.").[11] To the extent that Plaintiffs' claims
against the Government allege negligent hiring, supervision,
retention, or training, those claims will be dismissed. To the
extent Plaintiffs' remaining claims are premised on duties
created by the DoD regulations, the court finds them to be
barred by the intentional tort exception and the FTCA's private-
person principle, and they will be dismissed.[12]

Plaintiffs are correct, however, that the mere presence of
negligent supervision allegations precluded by the intentional
tort exception does not foreclose all of their claims. For
example, even after Sheridan I and Sheridan II a general state
law assumption of the duty negligence theory can support an FTCA
claim. Sheridan II, 969 F.2d at 74 (noting that plaintiffs
dropped their claim predicated on the conduct of the three

---

[11] Nevertheless, the court will consider briefly the DoD
regulations in its analysis of Plaintiffs' assumption of a duty
claim.

[12] This court notes that Plaintiffs specifically argue that
any allegations regarding the failure to complete a thorough
background check are limited to the Individual Defendants.
(Pls.' Opp'n Br. (Doc. 46) at 14 n.2.) Because the Bivens claims
against Individual Defendants will all be dismissed under Ziglar
v. Abbasi, 582 U.S. ____, 137 S. Ct. 1843 (2017), see infra at
72-94, the court need not address the alleged failure to obtain
a thorough background check in detail.

corpsmen, i.e., abandoning a drunk corpsman possessing a rifle without notifying authorities, which the Supreme Court had suggested could form a state law duty independent of the tortfeasor's employment). Stated another way, notwithstanding the DoD regulations, the issue remains "whether a private person could be held liable in North Carolina if he or she were to commit the acts alleged in the Complaint . . . by the Government." Lumsden v. United States, 555 F. Supp. 2d 580, 587 (E.D.N.C. 2008).

In Sheridan I, the Supreme Court specifically stated that "[t]he negligence of other Government employees who allowed a foreseeable assault and battery to occur may furnish a basis for Government liability that is entirely independent of [the tortfeasor's] employment status." Sheridan I, 487 U.S. at 401. At its core, the Complaint alleges that the Government failed to protect Minor Plaintiffs from foreseeable abuse and to report abuse when it occurred, in violation of North Carolina law and a federal reporting statute. The Complaint alleges negligence against the Government through acts and omissions of the Individual Defendants themselves, not Nevarez, and many of the allegations "cannot reasonably be read to allege that the plaintiffs are seeking relief from the Government arising from an intentional assault and battery inflicted by [Nevarez]." See

Lumsden, 555. F. Supp. 2d at 584. Instead, as Plaintiffs argue, Nevarez's "employment by the Government is irrelevant to [much of] the plaintiff's theory of liability." Id. (citing Sheridan I, 487 U.S. at 402); (see also Pls.' Opp'n Br. (Doc. 46) at 14 (arguing that the Government's duties would apply here whether Nevarez was a teacher, volunteer, or "off-the-street vagrant").) But that is only half of the inquiry. Plaintiffs must also plausibly allege facts to satisfy the FTCA's private-person principle – i.e., that the Government could be liable to Minor Plaintiffs as a private person under North Carolina law. That private-person inquiry requires the court to determine whether Plaintiffs plausibly state a negligence claim under North Carolina law. Under North Carolina law, a defendant cannot be held liable for negligence without owing a duty to plaintiff, breaching that duty, and proximately causing an injury. Stein v. Asheville City Bd. of Educ., 360 N.C. 321, 328, 626 S.E.2d 263, 267 (2006)).

This court therefore turns to whether the Complaint plausibly establishes a duty owed by the Government to Minor Plaintiffs under any of Plaintiffs' six theories of negligence under North Carolina law. See Durden v. United States, 736 F.3d 296, 302 (4th Cir. 2013); see also Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc., 840 F.2d 236, 239 (4th Cir. 1988)

(citing Bell v. Hood, 327 U.S. 678, 682 (1946) ("[W]hen the contested basis for jurisdiction is also an element of the plaintiff's federal claim, the claim should not be dismissed for lack of subject matter jurisdiction.").) Plaintiffs' theories essentially fall into two categories: those premised on a duty of ordinary care to prevent foreseeable harm – which all persons in North Carolina owe to each other, and those premised on a heightened duty of care.

### E.    12(b)(6) Analysis

In analyzing each alleged duty in the FTCA context, this court's job is to predict how the Supreme Court of North Carolina would rule on any disputed state law questions if no controlling precedent exists. See Menard v. United States, No. 4:15-CV-160-D, 2016 WL 4258978, at *3 (E.D.N.C. Aug. 10, 2016) (citing Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co., 433 F.3d 365, 369 (4th Cir. 2005)). In predicting how the North Carolina Supreme court might decide an issue, this court also "'consider[s] lower court opinions, treatises, and the practices of other states.'" Menard, 2016 WL 42589878, at *3 (quoting Twin City Fire Ins., 433 F.3d at 369). This court "'follow[s] the decision of an intermediate state appellate court unless there is persuasive data that the highest court would decide differently.'" Menard, 2016 WL 42589878, at *8

(quoting <u>Town of Nags Head v. Toloczko</u>, 728 F.3d 391, 397-98 (4th Cir. 2013)).

1.  **Claim I: Breach of Duty to Protect,
    Investigate, and Remediate Given a Reasonably
    Foreseeable Risk; Claim VI: Premises Liability**

In their first claim for relief, Plaintiffs allege breach of a duty to protect, investigate, and remediate given a reasonably foreseeable risk. (Am. Compl. (Doc. 39) ¶¶ 298-04.) Plaintiffs allege that the Government knew or had reason to know that Nevarez was sexually abusing Minor Plaintiffs, and would continue to do so, because:

> (i) Nevarez had a criminal background; (ii) Danny refused to attend school; (iii) Danny's mother reported Danny's change in behavior concerning school; (iv) in October 2011, Adam and his mother reported that Nevarez sexually abused Adam; and (v) in November 2011, Wyatt and his mother reported that Nevarez sexually abused Wyatt.

(<u>Id.</u> ¶ 299.) The parties agree that the Government owed Minor Plaintiffs a duty to exercise ordinary care to protect them only from foreseeable harm, which North Carolina law imposes upon all persons. <u>See</u> <u>Fussell v. N.C. Farm Bureau Mut. Ins. Co.</u>, 364 N.C. 222, 226, 695 S.E.2d 437, 440 (2010); <u>see also</u> <u>James v. Charlotte-Mecklenburg Bd. of Educ.</u>, 60 N.C. App. 642, 648, 300 S.E.2d 21, 24 (1983) ("[F]oreseeability of harm . . . is the test of the extent of the teacher's duty . . . .").

In Plaintiffs' sixth claim for relief, a premises liability claim, they allege that the Government, as "occupant or possessor" of Pope Elementary: (i) owed "all occupants a reasonable duty of care, including the duty to protect elementary school-aged students from reasonably foreseeable harms;" (ii) had a "special relationship with the Plaintiffs because of their status as elementary school students," and (iii) "breach[ed] its duty to care for the premises." (Am. Compl. (Doc. 39) ¶¶ 344, 346, 349.) To the extent that Plaintiffs allege that their sixth claim for relief is based on a special relationship, it will be dismissed for the reasons discussed herein, see infra at 54-58. To the extent that Plaintiffs generally assert a premises liability claim based on the Government's duty to those who enter the premises, the viability of that claim turns on the foreseeability of Nevarez's abuse. See Durden, 736 F.3d at 302 (quoting Davenport v. D.M. Rental Props., Inc., 217 N.C. App. 133, 135, 718 S.E.2d 188, 189-90) (2011) ("In North Carolina, 'a landlord has a duty to exercise reasonable care to protect his tenants from third-party criminal acts that occur on the premises if such acts are foreseeable.'").) The duty of reasonable care varies depending on the circumstances, including the type of business and activities involved. See Martishius v. Carolco Studios, Inc.,

355 N.C. 465, 473-74, 562 S.E.2d 887, 892-93 (2002) (citations omitted). Foreseeability is therefore the key issue as to Plaintiffs' first and sixth claims.

A plaintiff can establish foreseeability by plausibly alleging that "the defendant might have foreseen that some injury would result from his or her act or omission, or that consequences of a generally injurious nature might have been expected." Hart v. Curry, 238 N.C. 448, 449, 78 S.E.2d 170, 170 (1953) (citations omitted). As the Fourth circuit explained in Durden, foreseeability under North Carolina law can be established by knowledge of a specific threat against an individual or through evidence of the tortfeasor's prior criminal activity. Durden, 736 F.3d at 302 (citing Connelly v. Family Inns of Am., Inc., 141 N.C. App. 583, 588, 540 S.E.2d 38, 41 (2000); Davenport, 217 N.C. App. at 138, 718 S.E.2d at 191). The location, type, and amount of prior criminal activity are especially probative factors. Durden, 736 F.3d at 302 (citing Connelly, 141 N.C. App. at 588, 540 S.E.2d at 41).

This court finds that Nevarez's alleged criminal background, Danny's refusal to attend school in the spring of 2011, and Danny's mother's meetings with a social worker and then-Principal Grim in June 2011 do not plausibly establish that Nevarez's subsequent abuse was foreseeable.

Plaintiffs allege that Nevarez was accused of sexually abusing children prior to his employment at Pope Elementary and that his background "contained indicators of possible inappropriate student-teacher interactions." (Am. Compl. (Doc. 39) ¶ 352.) Plaintiffs further allege that the Individual Defendants failed to conduct a "proper and complete" background check by not obtaining clearance from Puerto Rico and Defendant Marsh admitted that Defendants would not have hired Nevarez if they had obtained a background check from Puerto Rico. (Id. ¶ 353-55.)[13] But the Government hired Nevarez after an FBI background investigation. (Id. ¶ 354.) And Plaintiffs do not allege that the Government had knowledge of an incident of child abuse in Puerto Rico. Defendant Marsh's alleged admission, in May 2012, that Nevarez's conduct in Puerto Rico would have dissuaded Defendants from hiring Nevarez, without more, is of no weight in determining what Defendants knew before Nevarez's abuse of Minor Plaintiffs and of little probative value to this court in trying to determine whether prior criminal activity was akin to that alleged here in location, type, and amount. Plaintiffs also allege that a thorough background check "likely

---

[13] The court notes that these allegations, to the extent they are alleged against the Government, would likely be dismissed under the intentional tort exception. The court considers them nevertheless.

would have revealed" a 2006 allegation against Nevarez from Hoke County High School in North Carolina. (Id. ¶ 46-48.) But that conclusory allegation is unsupported by the Complaint itself, as the FBI conducted a background check, and Defendants received a "domestic" background check, just not clearance from Puerto Rico. (Id. ¶¶ 50, 354.)

The Investigation Report also describes inappropriate conduct by Nevarez at Fort Bragg's Irwin Elementary in January or February 2011. The allegations that Nevarez hugged students, targeted kids with disabilities, stared at girls' behinds, and spoke face-to-face with students, (id. ¶ 52), simply do not plausibly suggest knowledge of a specific threat or contribute to a consideration of prior criminal activity or future child abuse. The allegations, without more, are not reflective of criminal behavior. Plaintiffs rely on these allegations from the Investigation Report to allege that Defendants "knew about Nevarez's sexual abuse . . . as early as January or February 2011." (Id. ¶ 221). This court does not find such an inference plausible. The Investigation Report also allegedly contains a statement from an unidentified Fort Bragg student that Nevarez pulled kids into bathrooms, "touch[ed] their wieners, and s[et] them on his lap." (Id. ¶ 54.) Plaintiffs allege that the student reported Nevarez's abuse to two unidentified people at an

unalleged time. Plaintiffs then allege, upon information and belief, that the two unidentified persons were the unidentified student's teacher and principal, who both failed to report the matter. This student's disclosure to the two individuals could have occurred as a result of the investigation itself, making it of minimal value to a foreseeability inquiry. The court simply cannot infer one way or the other. Plaintiffs also rely on the Investigation Report to allege that Nevarez sexually molested two other Pope Elementary students in September 2011. Plaintiffs do not allege when these incidents were reported, and they too could have been reported for the first time during the criminal investigation. While these allegations are troubling, the court hesitates to rely on them to impute knowledge to Defendants of Nevarez's potentially criminal activity at the relevant time. What the Government knew after the Investigation Report in late 2011 or early 2012 is not as relevant as what it knew in 2010 through mid-2011. Understanding that Plaintiffs have limited access to relevant sources of information at this stage, including only a redacted copy of the Investigation Report, the court nevertheless declines to find that Nevarez's abuse was foreseeable based on non-criminal activity or conclusory allegations of prior criminal activity without more. See, e.g., Nemet Chevrolet, Ltd. v. Consumeraffaris.com, Inc., 591 F.3d

250, 255 (4th Cir. 2009) (citing <u>Iqbal</u>, 556 U.S. at 678) ("[B]are assertions devoid of further factual enhancement fail to constitute well-pled facts for Rule 12(b)(6) purposes.").

Similarly, Danny's resistance to attending school sometime in the spring of 2011, his and his mother's meeting with a social worker, and his mother's meeting with then-Principal Grim do not plausibly establish the foreseeability of Nevarez's alleged abuse of Minor Plaintiffs. In hindsight, Danny's behavior might have been indicative of sexual abuse. In North Carolina, however, the duty of ordinary care "does not require perfect prescience . . . ." <u>Fussell</u>, 364 N.C. at 226, 695 S.E.2d at 440. Plaintiffs' allegations concerning Nevarez's previous abuse at other schools state that the abuse was not reported, making it less likely that the social worker and then-Principal had any heightened suspicion of child abuse. The social worker's suspicion that Danny's behavior stemmed from Danny's father's deployment to Afghanistan, and Principal Grim's suspicion that Danny was having general behavioral issues typical of children his age, were both reasonable. (<u>See</u> Am. Compl. (Doc. 39) ¶¶ 65, 67.)

Plaintiffs rely primarily on Adam's October 11, 2011 disclosure to establish the Government's knowledge of a specific threat and knowledge of Nevarez's prior criminal activity.

(Pls.' Opp'n Br. (Doc. 46) at 15-16.)[14] Adam's disclosure,
Plaintiffs argue, was particularly probative because the
disclosure detailed abuse in the same location, of the same
type, and of a sufficient amount given that it was the very same
conduct that allegedly occurred immediately after Adam's
disclosure. (Id. at 16-18 (citing Durden, 736 F.3d at 302;
Connelly, 141 N.C. App. at 588, 540 S.E.2d at 41).)

The Government relies on the Fourth Circuit's decision in
Durden to argue that Adam's disclosure does not establish
foreseeability. (Gov't Br. (Doc. 41) at 27.) In Durden, the
Fourth Circuit held that an Army Specialist's rape of a Fort
Bragg resident was not foreseeable based on the Specialist's
prior statements that he wanted to kill himself and other
members of his Army unit, as well as a prior burglary and
assault occurring off of the military installation. 736 F.3d at
302-04. The Fourth Circuit found that mere desires to harm
others did not constitute "prior criminal activity" for

_____

[14] This court summarily finds that the Complaint alleges no
facts as to Minor Plaintiffs Robby or Timmy to establish the
foreseeability of Nevarez's abuse prior to Adam's October 11,
2011 disclosure. Plaintiffs do allege that Defendants assigned
Nevarez to work with Robby after Adam's October 2011 disclosure.
Because this court ultimately finds that Plaintiffs plausibly
establish foreseeability through Adam's disclosure, Plaintiffs
are entitled to discovery to ascertain if and how many times the
Government assigned Nevarez to Timmy's classroom and to work
with Robby after Adam's disclosure.

foreseeability purposes. See id. at 303. The court also found that the Specialist's burglary and assault three months prior did not make the rape foreseeable because of the third foreseeability factor outlined in Connelly – the amount of prior criminal activity. Durden, 736 F.3d at 304 (citing Murrow v. Daniels, 321 N.C. 494, 501-03, 364 S.E.2d 392, 397-98 (1988); Connelly, 141 N.C. App. at 589, 540 S.E.2d at 42; Urbano v. Days Inn of Am., Inc., 58 N.C. App. 795, 798, 295 S.E.2d 240, 242 (1982)). In Durden, plaintiff's reliance on a single incident of prior criminal activity three months prior was insufficient to "render a future attack foreseeable." 736 F.3d at 304.

Applying Durden to Adam's disclosure, the Government argues that, like the rapist's prior suicidal and homicidal expressions, "there [wa]s nothing obviously criminal in what Adam allegedly said." (Gov't Br. (Doc. 41) at 29.) At this motion to dismiss stage, this court is not convinced. Plaintiffs allege that, on October 11, 2011, Adam told Defendant Coleman that "Nevarez was touching him and making him sit on Nevarez's lap and that he did not want to attend school anymore because he was scared that Nevarez would be there and touch him again." (Am. Compl. (Doc. 39) ¶ 81.) Adam's stated fear about Nevarez to Coleman, which she allegedly disclosed to McBroom and Nevarez, plausibly establishes the Government's knowledge of a specific

threat against Adam at this time. The weight and credibility to be assigned Adam's report cannot be fully assessed at this time. However, at the very least, Adam's report of uninvited touching and related conduct, coupled with Adam's alleged psychological discomfort with that contact, give rise to a plausible concern with Nevarez's physical contact with a student. Reporting the information directly to the accused teacher plausibly suggests that Defendants ignored a clear statement of potential child abuse and further ignored the potential for some type of retaliation, which Plaintiffs allege occurred. (See id. ¶¶ 98-102.)

The court also finds that Plaintiffs plausibly allege foreseeability through Adam's disclosure under the three-factor prior criminal activity framework from Connelly, applied by the Fourth Circuit in Durden. Under North Carolina law, taking indecent liberties with a student is a crime. See N.C. Gen. Stat. § 14-202.4(d)(1). "Indecent liberties" means:

> (a) willfully taking or attempting to take any immoral, improper, or indecent liberties with a student for the purpose of arousing or gratifying sexual desire; or (b) willfully committing or attempting to commit any lewd or lascivious act upon or with the body or any part or member of the body of a student.

Id. A nine- or ten-year-old boy's allegation that a teacher was touching him and that he was scared to return to school because

of that touching is plausibly probative of prior criminal activity. The full scope of the activity, the potential notice, and whether it was sufficient to place Defendants on notice will have to be addressed at a later stage of the proceedings. Further, as Plaintiffs reiterated at oral argument, the Complaint alleges that Adam's mother used the term sexual abuse in her discussion with Coleman and that Coleman responded that Defendants take allegations of sexual abuse seriously. (Am. Compl. (Doc. 39) ¶¶ 85, 88.) Plaintiffs allege that Coleman understood the seriousness of the disclosure, whether she and McBroom found it reasonable is not a question that can be resolved in this case at the motion to dismiss stage.

Adam's disclosure concerned abuse of the exact same type and in the exact same location as that which allegedly immediately followed Coleman's conversation with Nevarez. While a single incident of prior criminal activity (a burglary and assault) did not establish the foreseeability of a later criminal act (rape) in Durden, 736 F.3d at 304, this court does not find as a matter of law, at this juncture, that a single incident indicating child sexual abuse cannot establish the foreseeability of a subsequent act of child abuse.

This court's research suggests that courts have drawn no bright lines regarding the number and frequency of criminal

incidents that will give rise to a duty to protect from foreseeable harm. The court acknowledges that caselaw from both North Carolina and other jurisdictions suggests that neither a single incident nor sporadic incidents of prior criminal activity are sufficient at various stages of the proceedings to establish foreseeability. See, e.g., Connelly, 141 N.C. App. at 589, 540 S.E.2d at 42 (one hundred instances over five years sufficient); Murrow, 321 N.C. at 501-03, 364 S.E.2d at 397-98 (one hundred instances over four-and-a-half years sufficient); Urbano, 58 N.C. App. at 798, 295 S.E2d at 242 (forty-two instances over three years and twelve in three-and-a-half months immediately preceding alleged harm sufficient); Sawyer v. Carter, 71 N.C. App. 556, 562, 322 S.E.2d 813, 817 (N.C. Ct. App. 1984) (occasional robberies in the same general area and one at same location five years prior insufficient); Grisham v. Wal-Mart Stores, Inc., 929 F. Supp. 1054, 1058 (E.D. Ky. 1995), aff'd sub nom. Grisham v. Wal-Mart Properties, Inc., 89 F.3d 833 (6th Cir. 1996) (unpublished table decision) (citation omitted) (single act insufficient); Garner v. McGinty, 771 S.W.2d 242, 248 (Tex. App. 1989) (single act three months prior insufficient). None of these cases, however, including most importantly those North Carolina cases that the Fourth Circuit relied on in Durden - Connelly, Murrow, and Urbano, see Durden,

736 F.3d at 304 – involved child abuse. For that reason, this court does not find them particularly compelling on the foreseeability issue.

The mandatory reporting regimes in this criminal context make child abuse unique. In addition, in light of both state and federal sex offender registration requirements, see, e.g., N.C. Gen. Stat. § 14-208.5 et seq. and 34 U.S.C. § 20901 et seq., it seems reasonable to infer that sexual abuse carries a heightened risk of future crimes in comparison to other criminal conduct. The reporting and registration requirements exist in part to prevent likely recurrence. And their existence – and non-existence in other criminal contexts – evinces the significance of a single act of child abuse. This court therefore finds that Plaintiffs plausibly allege foreseeability based on Adam's disclosure.

Plaintiffs plausibly allege the Government's breach of its duty to Minor Plaintiffs as well. Plaintiffs allege that Defendant McBroom assigned Nevarez to the Minor Plaintiffs' classrooms on seventeen days after Adam's disclosure, that they assigned Nevarez to work with Robby after Adam's disclosure, and explicitly that Nevarez's abuse of Adam continued after Adam's disclosure. The court can plausibly infer from the timing of Wyatt's November 2011 disclosure and Danny's early 2012

disclosure that Nevarez abused them after Adam's disclosure. These allegations are enough to survive a motion to dismiss. See, e.g., Daniels ex rel. Webb v. Reel, 133 N.C. App. 1, 11, 515 S.E.2d 22, 29 (1999) (citation omitted) ("Ordinarily, it is a jury's province to determine issues of breach and causation.").

Plaintiffs are entitled to discovery to unearth the Government's response to Adam's disclosure, its actions and omissions in the interim between Adam's disclosure and Nevarez's removal from the base (whenever that date certain is uncovered to be), and the facts and circumstances surrounding any assignment of Nevarez to Minor Plaintiffs' classrooms or as Robby's parapro in the weeks that followed Adam's disclosure.[15]

The Government's motion to dismiss Plaintiffs' first and sixth claims will be denied as to all Plaintiffs and as to the

---

[15] The court finds at this motion to dismiss stage that any abuse of Minor Plaintiffs that postdated Adam's disclosure was foreseeable. In addition, the court finds that Wyatt's November 8, 2011 disclosure contributes to a foreseeability finding. While it appears that Defendants removed Nevarez from the classroom immediately thereafter, Plaintiffs allege that Nevarez had ongoing access to Minor Plaintiffs until March 2012.

Government's actions beginning on October 11, 2011 and continuing thereafter.[16]

## 2. Claim II: Assumption of a Duty/Good Samaritan

In their second claim for relief, Plaintiffs allege that the Government voluntarily assumed a duty to protect from, report, investigate, and treat sexual abuse. Plaintiffs allege that "a federal statute, and a series of Army regulations, policy statements, memoranda, and reports have imposed on the Defendants a duty to prevent, report, investigate, identify, and treat children who are sexually abused in DoDEA schools," (Am. Compl. (Doc. 39) ¶ 36), and that the Government "assumed these duties and engaged in specific tasks and provided specific

---

[16] At this point, Plaintiffs' first and sixth claims for relief are plausible based on the Government's alleged knowledge that arose on or after October 11, 2011. It might be that discovery reveals facts that would allow the Plaintiffs to plausibly allege an earlier date. For that reason, the court will dismiss allegations preceding October 11, 2011 without prejudice to Plaintiffs amending the Complaint on a later date to allege the Government's knowledge on an earlier date if facts gleaned during discovery support amendment.

services in order to fulfill these mandates." (Id.)[17] Plaintiffs

argue that their second claim for relief states a claim under

North Carolina's Good Samaritan doctrine, imposing analogous

duties to the DoD Regulations. (Pls.' Opp'n Br. (Doc. 46) at

20.)

An agency of the United States must perform a task it has

voluntarily undertaken with due care. Rogers v. United States,

397 F.2d 12, 14 (4th Cir. 1968). But the FTCA's law-of-the-place

requirement asks whether the United States assumed a duty to act

with reasonable care in accordance with North Carolina's Good

Samaritan doctrine, if one exists.

North Carolina courts have recognized a Good Samaritan

duty. Edwards v. GE Lighting Sys., Inc., 200 N.C. App. 754, 758,

---

[17] For the reasons provided herein, this court has already
found that the DoD regulations do not create an independent duty
because they are either ensnared by the intentional tort
exception or certain duties (e.g., to investigate and treat
child abuse) are precluded by the FTCA's private-person
principle. In addition, in Sheridan II, the Fourth Circuit
concluded that the Navy's promulgation of the two firearms-
related regulations did not establish a duty under the Maryland
Good Samaritan doctrine because plaintiffs "suffered no greater
risk of harm . . . because of the gratuitous promulgation of the
regulations and their breach than if the [government] had never
promulgated such regulations in the first instance." 969 F.2d at
74-75; but cf. Peal by Peal v. Smith, 115 N.C. App. 225, 230-31,
444 S.E.2d 673, 677 (1994), aff'd, 340 N.C. 352, 457 S.E.2d 599
(1995) ("[I]t is well established in North Carolina that the
breach of a voluntarily adopted safety rule is some evidence of
defendant's negligence."). Plaintiffs here do not demonstrate
how the Government's promulgation of the DoD regulations made it
more likely that Nevarez would sexually abuse the children.

685 S.E.2d 146, 149 (2009); see also Davidson v. Univ. of N.C. at Chapel Hill, 142 N.C. App. 544, 558, 543 S.E.2d 920, 929 (2001) (citing Pinnix v. Toomey, 242 N.C. 358, 362, 87 S.E.2d 893, 897 (1955)) ("The voluntary undertaking theory has been consistently recognized in North Carolina, although it is not always designated as such."). In North Carolina, "under certain circumstances, one who undertakes to render services to another which he should recognize as necessary for the protection of a third person . . . is subject to liability to the third person, for injuries resulting from his failure to exercise reasonable care in such undertaking." Edwards, 200 N.C. App. at 758, 685 S.E.2d at 149.

Plaintiffs cite Boles (a case applying Virginia law) as an example of a case where a court allowed an assumption of duty claim. (Pls.' Opp'n Br. (Doc. 46) at 12 (citing Boles v. United States, 3 F. Supp. 3d 491, 501 (M.D.N.C. 2014)).) There, Coast Guard employees assisted a colleague with mental health issues in storing his firearms in the Coast Guard Armory, and, in so doing, allegedly assumed a duty to act with reasonable care in that undertaking. Boles, 3 F. Supp. 3d at 505-06. The plaintiff alleged that the Coast Guard employees breached their assumed duty when they later assisted the tortfeasor in removing his firearms from the Coast Guard's Armory in violation of a

protective order (that one of them knew about) and failed to warn the tortfeasor's wife, ultimately leading to the plaintiff's injury. Id. at 505. The court in Boles looked to the Restatement (Second) of Torts § 324A, which Virginia courts apply in formulating Virginia's assumption of duty doctrine, and found that the plaintiff plausibly alleged that he was in the class of persons who could be harmed upon the Coast Guard employees' return of the firearms. Id. at 507.

In Edwards, the North Carolina Court of Appeals implied that North Carolina's voluntary assumption of the duty was derived from the Restatement (Second) of Torts § 324A. See 200 N.C. App. at 758, 685 S.E.2d at 149. There is some dispute within the North Carolina courts, however, as to the Restatement's authority. Compare Edwards, 200 N.C. App. at 758, 685 S.E.2d at 149; Quail Hollow E. Condo. Assoc. v. Donald J. Scholz Co., 47 N.C. App. 518, 522-24, 268 S.E.2d 12, 15-17 (1980) (relying upon the Restatement (Second) of Torts § 324A in finding a voluntarily assumed duty to protect a third party), with Cassell v. Collins, 344 N.C. 160, 163, 472 S.E.2d 770, 772 (1996) (citation omitted) ("We reemphasize yet again that the Restatement of Torts is not North Carolina law."), abrogated on other grounds by Nelson v. Freeland, 349 N.C. 615, 507 S.E.2d 882 (1998); Hedrick v. Rains, 344 N.C. 729, 729, 477 S.E.2d 171,

172 (1996) ("[W]e note with disapproval the citation of the Restatement (Second) of Torts as authority. Except as specifically adopted in this jurisdiction, the Restatement should not be viewed as determinative of North Carolina law."). This court is currently unaware of any decision by the North Carolina Supreme Court explicitly adopting Sections 323 or 324A of the Restatement of Torts. See Dawkins v. United States, 226 F. Supp. 2d 750, 755 (M.D.N.C. 2002) ("[T]he North Carolina Supreme Court has not recognized a tort law duty based upon Section 324A of the Restatement of Torts."). And in light of the North Carolina Supreme Court's admonitions in Cassell and Hedrick, this court finds it unlikely that the North Carolina Supreme Court would impose the Restatement's formulation of the Good Samaritan duty on a private person under the circumstances here.

Comparing Lumsden and Durden, both FTCA cases where federal courts applied North Carolina law, is helpful here. In Lumsden, a Marine corpsman's vehicle was impounded after he was caught inhaling ether. 555 F. Supp. 2d at 582. Marine corpsmen later returned the vehicle to him, and the corpsman then inhaled an intoxicating amount of ether remaining in the vehicle, drove his vehicle, and caused an accident, killing one. Id. The court in

Lumsden framed its inquiry as to the plaintiff's general negligence theory as:

> [I]f a private person were to deliver to a known abuser of the chemical compound, ether, both the keys to the known abuser's vehicle and a canister of ether belonging to the private person, would that private person be answerable to third parties injured when the known abuser foreseeably became dangerously intoxicated from huffing the ether, resulting in a traffic collision that caused injury and death . . . .

Id. at 588. The district court answered that question in the affirmative at the motion to dismiss stage, and the court found that plaintiff had plausibly alleged that the "Government's agents knew or had reason to know that upon being provided the keys to his car and a canister of ether," the defendant would do what he did, triggering a duty owed by the agents because that risk was both unreasonable and foreseeable. Id. at 589 (citing Mullis v. Monroe Oil Co., Inc., 349 N.C. 196, 205, 505 S.E.2d 131, 136-37 (1998)).

In Durden, the Fourth Circuit distinguished the conduct at issue from that in Lumsden. In Durden, the Government only knew about one prior criminal act by the tortfeasor when he raped the plaintiff – a burglary and non-sexual assault three months prior. 736 F.3d at 304-06. The government, however, did not know about other burglaries and sexual assaults committed by the tortfeasor until after the rape. Id. at 306. So when it released him from civilian confinement six weeks before the rape and

allegedly assumed a duty to protect the plaintiff, the Government did not know about the tortfeasor's prior sexual assaults. Id. at 305. Therefore, the Fourth Circuit found that there was "nothing in the record to indicate that the Army should have known that [the tortfeasor] was a threat to [plaintiff's] safety based solely on the [burglary and non-sexual assault]." Id. at 306. Significantly, the court wrote that "[i]t might be a different case if the Army knew that it was one of its own soldiers, and [the tortfeasor] specifically, that committed the 2008 and 2009 sexual assaults . . . ." Id. (emphasis added). Under those circumstances, the government might have assumed a duty to protect plaintiff upon the tortfeasor's release from civilian confinement. See id.

The Government's knowledge of an allegation from an actual victim of Nevarez's sexual abuse distinguishes this case from Durden. The court has already found that Plaintiffs plausibly allege that Nevarez's abuse after October 11, 2011 was foreseeable. Further, Plaintiffs allege that, during Adam's disclosure to Coleman, Adam's mother demanded that "something be done about Nevarez to prevent future abuse of her son and others . . . ." (Am. Compl. (Doc. 39) ¶ 88.) They further allege that Coleman assured Adam's mom that something would be done, and that Adam and his mother relied on Coleman to do what she

promised – "to report the matter [and] make sure it was investigated." (Id. ¶¶ 89, 92.) This voluntarily assumed duty arose "from the factual context immediately preceding the alleged assault(s) – and had nothing to do with [Nevarez's] employment relationship with the [DoD]." See Bajkowski v. United States, 787 F. Supp. 539, 542 (E.D.N.C. 1991). Though factually different from Lumsden, the inquiry in this case is the same: if a private person were to be in receipt of an allegation of sexual abuse, assured the complaining party that something would be done, took the allegation to the suspected abuser, and then left the abuser alone with the alleged child victim, would that private person be answerable to injured parties when the suspected abuser foreseeably sexually assaulted the victim, resulting in injury? See Lumsden, 555 F. Supp. 2d at 588. Taking the allegations in the Complaint as true at this motion to dismiss stage, this court has little trouble answering that question in the affirmative as to Adam.

In addition, at this stage of the proceedings, the court also views the Government's provision of services to an autistic child as a voluntary assumption of a duty, subjecting the Government to liability for their failure to exercise reasonable care in such undertaking. See Durden, 736 F.3d at 305 (quoting Quail Hollow E. Condo Ass'n, 47 N.C. App at 522, 268 S.E.2d at

15). Plaintiffs allege that the Government assigned Nevarez to work with Robby after Adam's disclosure. Doing so is plausibly unreasonable, though whether the Government used reasonable care in attending to the situation is generally a question for the jury. See Klassette v. Mecklenburg Cty. Area Mental Health, Mental Retardation & Substance Abuse Auth., 88 N.C. App. 495, 502, 364 S.E.2d 179, 184 (1988).

Wyatt, Danny, and Timmy's allegations here fall short. Because the court declines to find that the DoD regulations imposed a voluntarily assumed duty, Plaintiffs do not plausibly allege that the Government voluntarily assumed a duty to protect, report, investigate, and provide treatment as to Wyatt, Danny, or Timmy.

North Carolina courts generally require affirmative conduct before finding a voluntarily assumed duty, and the Complaint's allegations are deficient in that regard as to Wyatt, Danny, and Timmy. McCants, 201 F. Supp. 3d at 743 (collecting cases) ("[A] review of North Carolina court decisions confirms that imposition of an actionable duty of care based on any undertaking, irrespective of its source, requires affirmative conduct by the alleged tortfeasor."). Unlike Adam's disclosure, the Complaint does not plausibly allege an affirmative undertaking by Coleman or McBroom as to Wyatt, Danny, and Timmy

that would create a Good Samaritan duty under North Carolina law. The Complaint's allegations surrounding Wyatt's and Danny's disclosures actually suggest the opposite. (See Am. Compl. (Doc. 39) ¶¶ 128, 130 (alleging that McBroom offered Wyatt's parents nothing by way of assistance; alleging that nobody responded to Wyatt's parents' pleas for help); id. ¶¶ 59-68 (describing then-Principal Grim's and the social worker's dismissal of Danny's mom's concerns in June 2011).)

For these reasons, the Government's motion to dismiss Plaintiffs' second claim for relief will be granted as to Minor Plaintiffs Wyatt, Danny, and Timmy and denied as to Adam and Robby on the narrow ground that the Government voluntarily assumed a duty to protect, report, and investigate sexual abuse of Adam and Robby following the October 11, 2011 disclosure.

### 3. Claim III: Special Duty; Claim IV: Special Relationship

Plaintiffs allege in their third and fourth claims for relief a special duty and a special relationship between the Government and Minor Plaintiffs, respectively. (Am. Compl. (Doc. 39) ¶¶ 314-16, 324.) Portions of Plaintiffs' fifth and sixth claims for relief, predicated respectively on negligence per se and premises liability, also allege a special relationship. (Id. ¶¶ 340, 346.)

North Carolina courts have acknowledged an exception to the general rule that there is no duty to protect another from a third party where there exists a "special relationship between the defendant and [a] third person which imposes a duty upon the defendant to control the third person's conduct; or a special relationship between the defendant and the injured party which gives the injured party a right to protection." Scadden v. Holt, 222 N.C. App. 799, 802, 733 S.E.2d 90, 92 (N.C. Ct. App. 2012) (citation and internal quotation marks omitted). Special relationships, however, "arise only in narrow circumstances." Bridges v. Parrish, 366 N.C. 539, 541, 742 S.E.2d 794, 797 (2013). North Carolina courts have found that the following special relationships establish affirmative duties beyond an ordinary standard of care: "(1) parent-child; (2) master-servant; (3) landowner-licensee; (4) custodian-prisoner; and (5) institution-involuntarily committed mental patient." King v. Durham Cty. Mental Health Developmental Disabilities & Substance Abuse Auth., 113 N.C. App. 341, 346, 439 S.E.2d 771, 774 (1994); but cf. Davidson, 142 N.C. App. at 555, 543 S.E.2d at 927 (finding special relationship existed between university and its cheerleaders premised in part on the existence of mutual dependence but cautioning that the "holding should not be

interpreted as finding a special relationship to exist between a university . . . and every student").

North Carolina courts have had ample time and opportunity to add the school-student relationship to the enumerated special-relationship categories and they have declined to do so. Cf. Stevenson v. Martin Cty. Bd. of Educ., 3 F. App'x 25, 30-31 (4th Cir. 2001) (collecting cases) ("Several circuits have been faced with the issue of whether a school-student relationship is a special relationship triggering the protections of the Due Process Clause. They have held uniformly that no special relationship exists . . . ."). Instead, North Carolina courts consider the school-student relationship under a general negligence standard, i.e., teachers in North Carolina must "exercise [] ordinary prudence given the particular circumstances of the situation." Payne v. N.C. Dep't. of Human Res., 95 N.C. App. 309, 314, 382 S.E.2d 449, 452 (1989) (citation omitted) (declining to find that an instructor owed a deaf student a "greater than normal" duty). This court, therefore, finds that the Supreme Court of North Carolina would not find that a special relationship exists between the Government and Minor Plaintiffs.

Plaintiffs urge that North Carolina courts would find that a special relationship or duty exists here because of the

Government's unique ability to control Nevarez. (Pls.' Opp'n Br. (Doc. 46) at 24.) It is true that North Carolina courts have left open the possibility of additional special relationships. See e.g., Scadden, 222 N.C. App. at 802-03, 733 S.E.2d at 93 (footnote omitted) ("[W]here the underlying justification for imposing a duty to protect . . . applies, a court may find that a special relationship exists."). But a North Carolina court would likely look to its two-pronged test for establishing a special relationship, focusing on the government's (i) knowledge of the tortfeasor's violent propensities and (ii) ability to control the tortfeasor. See Durden, 736 F.3d at 305 (citing Stein, 360 N.C. at 331, 626 S.E.2d at 269 (setting forth the two-pronged test for a special relationship)).

Plaintiffs argue that, because the Army has the authority under 18 U.S.C. § 1382 to bar individuals from entering military bases, the Government's ability to control Nevarez was not dependent on the employment relationship. (Pls.' Opp'n Br. (Doc. 46) at 24.) 18 U.S.C. § 1382 prohibits any person from reentering any military installation "after having been removed therefrom or ordered not to reenter by any officer or person in command or charge thereof . . . ." While the court agrees with Plaintiffs that the DoD's right to control access to its military installations is in no way conditioned on the

employment status of entrants, it is conditioned on the
Government's status as the federal government (and the land's
status as property of the Army, Navy, or Coast Guard). Thus, the
Government's ability to control Nevarez is of no help in
satisfying the FTCA's private-person principle. See Durden, 736
F.3d at 305 (citing 28 U.S.C. § 1346(b)(1)). Setting aside the
Government's ability to control Nevarez through the employment
relationship or through its status as the military, the
Government had no ability to control Nevarez in a manner that
causes this court to hesitate in granting the Government's
motion to dismiss as to Claims III and IV, as well as Claims V
and VI to the extent they are premised on a special
relationship.

### 4. Claim V: Negligence Per Se

Plaintiffs premise their fifth claim for relief on the
doctrine of negligence per se. Under North Carolina law, to
prevail on a negligence per se claim, a plaintiff must plausibly
allege:

> (1) a duty created by a statute or ordinance; (2) that
> the statute or ordinance was enacted to protect a
> class of persons which includes the plaintiff; (3) a
> breach of the statutory duty; (4) that the injury
> sustained was suffered by an interest which the
> statute protected; (5) that the injury was of the
> nature contemplated in the statute; and (6) that the
> violation of the statute proximately caused the
> injury.

_Birtha v. Stonemor, N.C., LLC_, 220 N.C. App. 286, 293-94, 727

S.E.2d 1, 8 (2012) (citation omitted). More generally, the rule

in North Carolina is that "the violation of a public safety

statute constitutes negligence _per se_." _Stein_, 360 N.C. at 326,

626 S.E.2d at 266 (alterations and citation omitted). A public

safety statute is one "imposing upon the defendant a specific

duty for the protection of others." Id. (alterations and

citation omitted). "A member of a class protected by a public

safety statute has a claim against anyone who violates such a

statute when the violation is a proximate cause of injury to the

claimant." _Hart v. Ivey_, 332 N.C. 299, 303, 420 S.E.2d 174, 177

(1992) (citation omitted). However, "in FTCA cases courts have

generally refused to find the necessary state law duty in an

assertedly violated federal statute or regulation merely because

the law of the relevant state included a general doctrine of

negligence _per se_." _Boles_, 3 F. Supp. 3d at 509 (certain

citations omitted) (citing _Johnson v. Sawyer_, 47 F.3d 716, 728-

29 (5th Cir. 1995)). Rather, the negligence per se claim must be

cognizable under the state's negligence per se law. _Boles_, 3 F.

Supp. 3d at 509. That is, in order to premise a negligence per

se claim on the violation of a federal statute in the FTCA

context, a state's negligence per se doctrine must allow a

plaintiff to base the negligence per se claim on the asserted violation of a federal statute.

Plaintiffs appear to base their negligence per se claim on 34 U.S.C. § 20341 and the DoD regulations. Those, they allege, "were enacted and promulgated with the specific purpose of protecting the health, welfare, and public safety of the children of military families . . . from the well-recognized dangers of child sexual abuse." (Am. Compl. (Doc. 39) ¶ 336.)[18] Plaintiffs argue that 34 U.S.C. § 20341 "specifically requires school employees and officials working at federally operated facilities," to report suspected child abuse. (Pls.' Opp'n Br. (Doc. 46) at 25.) The Government argues that the federal bases for Plaintiffs' negligence per se claim must "impose[] a duty on a private person under North Carolina law." (United States' Reply in Supp. of Mot. to Dismiss ("Gov't Reply Br.") (Doc. 49) at 12-13.) The Government continues that Plaintiffs rely on only one federal statute, imposing reporting obligations upon only certain individuals on federal land, and Plaintiffs make no attempt to show that the federal statute satisfies the

---

[18] The court will focus on the reporting obligation under 34 U.S.C. § 20341. In addition to its previous discussion of the DoD regulations, the court notes that Plaintiffs have not attempted to analogize the DoD regulations allegedly requiring the Government to protect, investigate, and treat to any similar federal or state statute applicable to private persons that could support a negligence per se claim in North Carolina.

negligence per se standard under North Carolina law. (Id. at 13.) The Government further argues that, even if that statute, 34 U.S.C. § 20341, meets the negligence per se standard in North Carolina, the disclosures concerning Nevarez's conduct were not sufficient to trigger the reporting requirement under either the federal statute or analogous North Carolina statutes. (See id. at 13-14.) As the Government points out, Plaintiffs argue for the first time in their response brief that several North Carolina laws are analogous to 34 U.S.C. § 20341. (See Pls.' Opp'n Br. (Doc. 46) at 26.)

Courts generally do not consider a plaintiff's factual or legal allegations raised in opposition to a motion to dismiss and not alleged in the complaint. See, e.g., Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1107 (7th Cir. 1984) (collecting cases) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss."). In the FTCA context, however, the Fourth Circuit has instructed that courts should examine on their own "whether a private person would be responsible for similar negligence under the laws of the State where the acts occurred." Fla. Auto Auction, 74 F.3d at 505 (quoting Rayonier, Inc. v. United States, 352 U.S. 315, 319 (1957)). The court is also not convinced that the North Carolina statutes are necessary to the

disposition of the negligence per se claim, so it will exercise its discretion and consider them.

It appears that North Carolina courts would allow a negligence per se claim based upon a violation of a federal statute, which comports with Fourth Circuit precedent. See Richardson v. United States, No. 5:08-CV-620-D, 2011 WL 2133652, at *4 (E.D.N.C. May 26, 2011) (citing Fla. Auto Auction, 74 F.3d at 502 n.2.) ("A violation of a federal regulation can give rise to negligence per se liability under state [there, North Carolina] law."); see also Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg., 545 U.S. 308, 318-19 (2005) (citations and internal quotation marks omitted) ("The violation of federal statutes and regulations is commonly given negligence per se effect in state tort proceedings."); cf. Fulmore v. Howell, 227 N.C. App. 31, 34, 741 S.E.2d 494, 496 (2013) (assuming arguendo that the violation of the Code of Federal Regulations is per se negligence). In addition, at least one court has allowed a negligence per se claim to survive a motion to dismiss – in a pre-Iqbal case – predicated on the very reporting statute at issue here, 34 U.S.C. § 20341. See Zimmerman ex rel. Zimmerman v. United States, 171 F. Supp. 2d 281, 292-93 (S.D.N.Y. 2001). Therefore, at this stage of the proceedings, Plaintiffs plausibly allege that a private person under North Carolina law

could be liable on a theory of negligence per se predicated on a breach of the reporting obligation under 34 U.S.C. § 20341.

In addition, Plaintiffs argue that analogous North Carolina statutes contain reporting obligations that would apply to these facts. And the FTCA permits negligence suits where the alleged tortious breach of a duty "is tortious under state law" or where "the Government ha[s] breached a duty imposed by federal law that is similar or analogous to a duty imposed by state law." Fla. Auto Auction, 74 F.3d at 502 (citing Rayonier, 352 U.S. at 319; Goldstar (Panama) S.A. v. United States, 967 F.2d 965, 969 (4th Cir. 1992)). Plaintiffs analogize 34 U.S.C. § 20341 to N.C. Gen. Stat. § 115C-288(g), requiring school principals in North Carolina to report sexual assault, sexual offense, or indecent liberties with a minor upon actual notice or personal knowledge of such conduct. (Pls.' Opp'n Br. (Doc. 46) at 26.)[19] N.C. Gen. Stat. § 115C-288(g) is sufficiently analogous at this motion to dismiss stage to form the basis of Plaintiffs' negligence per se claim, to the extent a state law obligation must.

---

[19] Plaintiffs also cite N.C. Gen. Stat. § 115C-400, but the court agrees with the Government that the reporting obligations thereunder cover abuse not as relevant here. See N.C. Gen Stat. §§ 7B-101, 7B-301, 14-202.1; see also Boles, 3 F. Supp. 3d at 512 (declining a motion to amend to add a negligence per se claim premised on an inapplicable Virginia statute).

The Government also argues that the reporting obligations under 34 U.S.C. § 20341 and N.C. Gen. Stat. § 115C-288(g) are not applicable here because Adam's disclosure did not trigger them. (See Gov't Reply Br. (Doc. 49) at 13.) The court disagrees at this juncture. The statute defines child abuse to mean "the physical or mental injury, sexual abuse or exploitation, or negligent treatment of a child." 34 U.S.C. § 20341(c)(1). It defines "mental injury" as "harm to a child's psychological or intellectual functioning which may be exhibited by severe anxiety, depression, withdrawal or outward aggressive behavior, or a combination of those behaviors, which may be demonstrated by a change in behavior, emotional response or cognition." 34 U.S.C. § 20341(c)(3). The statute defines "sexual abuse" to include the use or coercion of a child to engage in sexually explicit conduct or molestation of children. 34 U.S.C. § 20341(c)(4). Further, a covered individual with a reporting obligation need only "learn[] of facts that give reason to suspect that a child has suffered an incident of child abuse." 34 U.S.C. § 20341(a)(1). The analogous North Carolina statute requires principals to report "sexual assault, sexual offense, . . . [or] indecent liberties with a minor," upon actual notice or personal knowledge of such conduct. N.C. Gen. Stat. § 115C-288(g). Under North Carolina law, "indecent

liberties" means the willful taking of any improper liberties with a child or student for the purpose of gratifying sexual desire or the willful committing of a lewd act upon the body of a child or student. See N.C. Gen. Stat. §§ 14-202.1(a), 14-202.4(d)(1).[20]

Based on the allegations in the Complaint, it is plausible that Adam's October 11, 2011 disclosure triggered the federal reporting obligation.[21] His disclosure put Coleman and McBroom on notice of, at the very least, Nevarez's mental injury of Adam demonstrated by Adam's anxiety and fear that Nevarez would be at school and touch him again, and plausibly gave them reason to suspect that Nevarez had sexually abused Adam as defined under 34 U.S.C. § 20341. While N.C. Gen. Stat. § 115C-288(g) requires actual notice or personal knowledge by the principal, Plaintiffs plausibly allege such notice by alleging that Coleman told Principal McBroom of Adam's disclosure, which at the very least,

---

[20] The Government argues, and not without some persuasive force, that Adam's 2011 disclosure does not amount to indecent liberties. This may prove to be true. However, the combination of the use of the term "touching," Adam's mental state, and his mother's allegations appear to plausibly suggest at least an inference of an improper liberty for the purpose of gratifying sexual desire.

[21] This court finds that Danny's change in behavior in the spring of 2011, disclosed to a social worker in June 2011 and then-Principal Grim shortly thereafter, as alleged, did not trigger a reporting obligation under 34 U.S.C. § 20341 or North Carolina law.

provided McBroom with notice that Nevarez had taken indecent liberties with Adam. The Complaint also alleges that the Government breached its duty by not following the reporting obligations after Adam's disclosure.

Alternatively, the November 2011 disclosure by Wyatt's parents to Defendants Coleman and McBroom likely triggered the reporting obligations. During that meeting, Coleman allegedly denied that Nevarez sexually abused any student, and the court can infer that the disclosure by Wyatt's parents raised a suspicion of sexual abuse, and the Complaint plausibly alleges McBroom's knowledge of indecent liberties. But it is less clear that the reporting obligations were not followed after Wyatt's disclosure. Plaintiffs allege that a November 8, 2011 report was prepared and provided to Defendant Sicinski and it appears that, after the disclosure by Wyatt's father to the Fort Bragg Military Police on November 8, 2011, a criminal investigation was opened shortly thereafter. At this time, however, the court does not find that Plaintiffs' allegations concerning the Government's noncompliance with its reporting obligations following Wyatt's November 2011 disclosure fail as a matter of law.

As to the Government's argument that 34 U.S.C. § 20341 does not satisfy the negligence per se standard under North Carolina

law, this court concludes that 34 U.S.C. § 20341 and its state law analogue are public safety statutes imposing specific duties for the protection of others, the violations of which constitute negligence per se. See Stein, 360 N.C. at 326, 626 S.E.2d at 266. Congress first introduced 34 U.S.C. § 20341 as part of the Victims of Child Abuse Act of 1990 ("VACA"), then at 42 U.S.C. § 13001 et seq., and the legislative history suggests that it is a public safety statute. See 136 Cong. Rec. S17595-01, S17600, 1990 WL 168469 ("[VACA is] a sweeping title aimed at mak[ing] our criminal justice system more effective in cracking down on child abusers, and more gentle in dealing with the child abuse victims."); 136 Cong. Rec. S17595-01, S17606-07, 1990 WL 168469 ("This bill has some really tough desperately needed child abuse reform provisions. These provisions put in place protections for the most defenseless Americans-our children."). So too with N.C. Gen. Stat. § 115C-288(g), which was "intended to require principals to report . . . to law enforcement officers in order to facilitate the investigation and prosecution of crimes in school." Powers and Duties of Principal; G.S. § 115C-288, Op. Att'y Gen. (Sept. 8, 1998). This court also finds that Minor Plaintiffs are members of the protected class.

Finally, Plaintiffs must plausibly allege that the reporting breach proximately caused Minor Plaintiffs' injuries.

Birtha, 220 N.C. App. at 293-94, 727 S.E.2d at 8. "Proximate cause is a cause which in natural and continuous sequence, unbroken by any new and independent cause, produced the plaintiff's injuries, and without which the injuries would not have occurred," and from which reasonably foreseeable consequences were probable. Hairston v. Alexander Tank & Equip. Co., 310 N.C. 227, 233, 311 S.E.2d 559, 565 (1984) (citations omitted). There can be more than one proximate cause of an injury. See State v. Leonard, 213 N.C. App. 526, 530, 711 S.E.2d 867, 871 (N.C. Ct. App. 2011) ("[E]ven if defendant's willful attempt to elude arrest was a cause of [the] injury, defendant's driving under the influence could also be a proximate cause."); see also Boles, 3 F. Supp. 3d at 513 ("While [tortfeasor's] intentional conduct was admittedly a proximate cause of [the plaintiff's] injuries, the alleged negligence of Coast Guard employees could also be a proximate cause . . . .").

Plaintiffs plausibly allege that the Government's failure to report the disclosed abuse "as soon as possible," 34 U.S.C. § 20341, was a proximate cause of at least one incident of alleged abuse of Adam. While Nevarez's intentional conduct was obviously a proximate cause of the alleged abuse, the Government's negligence could also be a proximate cause because Nevarez's actions were a natural consequence of the Government's

failure to report the abuse, thus delaying Nevarez's removal from the classroom and ultimately the base. Plaintiffs are entitled to discovery as to the facts and circumstances surrounding any reporting, or lack therefore, that occurred after Adam's October 11, 2011 disclosure.

It may well be that the Government will be entitled to summary judgment on this claim, but the Complaint plausibly alleges the existence of a duty supporting a negligence per se claim, a question of law. See Davidson, 142 N.C. App. at 552, 543 S.E.2d at 926. And issues of breach and causation are generally a jury's province. See Webb, 133 N.C. App. at 11, 515 S.E.2d at 29 (citation omitted).

Therefore, the Government's motion to dismiss Plaintiffs' fifth claim for relief, to the extent that it alleges negligence per se for failure to report suspected child abuse on or after October 11, 2011, will be denied; to the extent that the fifth claim for relief alleges negligence per se for failure to train personnel, to protect children from sexual abuse, to investigate such abuse, and to provide effective treatment, the Government's motion to dismiss Plaintiffs' fifth claim for relief will be granted.

### 5.  Miscellaneous Arguments

The Government argues that Robby's claim was untimely because Robby was suffering mental anguish and nightmares when Nevarez was removed from the school in November 2011, which is when the Government asserts that Robby's claim accrued. (Gov't Br. (Doc. 41) at 34-35.) Because Robby's claim was not presented to the Government until December 30, 2013, it was not timely filed within the requisite two years under the FTCA. (Id. (citing 28 U.S.C. § 2401(b)).)

Construing the facts in the light most favorable to Plaintiffs, it is not clear whether Robby was suffering his mental anguish and nightmares by November 2011, when Nevarez was removed from the classroom, or by March 2012, when Nevarez was removed from the installation. (See Am. Compl. (Doc. 39) ¶ 45.) Nevertheless, this court finds at this time that Robby's claim accrued on or around March 16, 2012, when Defendants told Robby's parents that Nevarez had abused Robby, and was therefore timely. The general rule is that, even though a child's minority does not toll the running of the FTCA's statute of limitations, see Jastremski v. Unites States, 737 F.2d 666, 669 (7th Cir. 1984), the FTCA's limitations period begins to run when the parents (or plaintiff-guardians) become aware or should have been aware of the existence and cause of injury, see Zavala v.

United States, 876 F.2d 780, 782 (9th Cir. 1989); MacMillan v.
United States, 46 F.3d 377, 381 (5th Cir. 1995) (citation
omitted); Miller v. United States, 803 F. Supp. 1120, 1128 (E.D.
Va. 1992) (citing Zavala, 876 F.2d at 782). This court is
currently unaware of a case imputing knowledge from a mentally
incompetent minor to that minor's parents for purposes of
meeting the FTCA's timeliness requirements.

The Government also argues that Plaintiffs' allegations
regarding the Government's failure to provide Minor Plaintiffs
with "prompt and effective treatment, care, and counseling,"
should be dismissed because they are medical malpractice claims
not brought in conformity with North Carolina Rule of Civil
Procedure 9(j), which requires a certification in the pleading
as to medical care and records. (Gov't Br. (Doc. 41) at 33-34);
see also N.C. R. Civ. P. 9(j). The Government argues that the
claims regarding tardy or ineffective medical treatment are
medical malpractice claims, clearly "aris[ing] out of the
furnishing or failure to furnish professional services . . . by
a health care provider." (Id. at 33 (quoting N.C. Gen. Stat.
§ 90-21.11(2)(a)).)

At this stage in the proceedings, the court rejects the
Government's argument. Plaintiffs' claims sound in ordinary
negligence and allege administrative and ministerial failures,

not failures to furnish professional services. See Stockton v.
Wake Cty., 173 F. Supp. 3d 292, 308 (E.D.N.C. 2016) (citing
Estate of Waters v. Jarman, 144 N.C. App. 98, 101-03, 547 S.E.2d
142, 144-46 (2001); Allen v. Cty. of Granville, 203 N.C. App.
365, 366-68, 691 S.E.2d 124, 125-27 (2010)). Thus, to the extent
those allegations have survived the Government's motion to
dismiss, they are not subject to the strictures of Rule 9(j).

III. **THE INDIVIDUAL DEFENDANTS' MOTION TO DISMISS**

    The Individual Defendants moved to dismiss Plaintiffs'
Bivens claims pursuant to Rule 12(b)(6), arguing that they are
entitled to qualified immunity. (See Doc. 43 at 1, 12.)
Plaintiffs responded, (Doc. 47), and the Individual Defendants
replied, (Doc. 50). In their briefing, however, the parties
failed to address in any depth the threshold question of whether
a Bivens remedy is available to Plaintiffs. That inquiry is
especially salient after the Supreme Court's decision in Ziglar
v. Abbasi, where the Court cautioned lower courts about
extending Bivens to new contexts. 582 U.S. ____, ____, 137
S. Ct. 1843, 1857 (2017); cf. Liff v. Office of Inspector Gen.
for U.S. Dep't of Labor, 881 F.3d 912, 918 (D.C. Cir. 2018)
(internal quotation marks omitted) (quoting Hernandez v. Mesa,
____ U.S. ____, ____, 137 S. Ct. 2003, 2006 (2017)) ("[I]t is
appropriate to determine the availability of a Bivens remedy at

the earliest practicable phase of litigation because it is antecedent to the other questions presented."). This court, therefore, ordered supplemental briefing on whether, in light of Abbasi, a Bivens remedy should be available to Plaintiffs here, asking the parties to address specifically the availability of alternative remedies. (See Text Order 02/13/19.) The Individual Defendants and Plaintiffs each submitted a ten-page brief on the issue. (Defs.' Suppl. Br. (Docs. 54, 56); Pls.' Suppl. Br. (Doc. 55).)

For the reasons that follow, this court will not extend an implied cause of action to Plaintiffs to vindicate the constitutional wrongs allegedly committed by these federal officers in this new Bivens context. Plaintiffs' Claims VII-X will be dismissed.[22]

### A. *Bivens* Claims

In Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, the Supreme Court created a federal cause of action against federal officers for their violations of the Fourth Amendment. See 403 U.S. 388, 389 (1971). The Supreme Court's decision, however, did not create general purpose liability for

---

[22] The dismissal will include any allegations against the John/Jane Doe Defendants, who at all relevant times were the employees who failed to complete a thorough background check of Nevarez and adequately train employees. (See Am. Compl. (Doc. 39) ¶¶ 31-32.)

federal officials. Rather, the scope of _Bivens_ liability is limited, allowing claims against defendants sued in their individual capacities based only on their own wrongdoing. See _Norton v. United States_, 581 F.2d 390, 393 (4th Cir. 1978). A defendant must have directly and personally participated in violating a plaintiff's constitutional rights. Thus, there is no respondeat superior liability in a _Bivens_ action, _Trulock v. Freeh_, 275 F.3d 391, 402 (4th Cir. 2001), and alleging mere negligence is not enough, _Housecalls Home Health Care, Inc. v. United States Department of Health & Human Services_, 515 F. Supp. 2d 616, 624 (M.D.N.C. 2007) (citing _Oxendine v. Kaplan_, 241 F.3d 1272, 1275 (10th Cir. 2001)).

**B.    The Supreme Court's _Abbasi_ Framework**

In _Abbasi_, the Supreme Court recently urged lower courts to exercise restraint in creating implied causes of action against federal officials to enforce constitutional rights in new contexts. See 137 S. Ct. at 1857. The Court went so far as to clarify that "expanding the _Bivens_ remedy is now a 'disfavored' judicial activity." _Id._ (quoting _Iqbal_, 556 U.S. at 675).

In _Abbasi_, a group of aliens who were detained after the September 11th attacks brought claims against officers in the Department of Justice and the wardens of the facility where they were detained. 137 S. Ct. at 1851-52. Plaintiffs sought to

invoke Bivens, alleging that their detention and related acts violated their Fourth Amendment rights and substantive due process and equal protection rights under the Fifth Amendment. Id. at 1853-54. Among other findings, the Supreme Court found that plaintiffs' Fifth Amendment substantive due process claims (the same constitutional violations alleged here) arose in a new Bivens context. Id. at 1864-65. The Supreme Court vacated the lower court's judgment and remanded for an analysis of any special factors counselling hesitation in applying Bivens to a new context. Id. at 1865.

Thus, whether a Bivens remedy is available depends on a two-step inquiry. First, the court must decide whether a plaintiff is seeking a Bivens remedy in a new Bivens context. See Abbasi 137 S. Ct. at 1859-60. If not, then the analysis under Abbasi is finished, and the court can analyze the merits of the claim. If the court determines that a case does arise in a new Bivens context, then second, before extending a Bivens remedy, the court must analyze whether there are "'special factors counselling hesitation in the absence of affirmative action by Congress.'" Id. at 1857 (quoting Carlson v. Green, 446 U.S. 14, 18 (1980); Bivens, 403 U.S. at 396).

### 1.  A New *Bivens* Context

This case arises in a new *Bivens* context. And, after briefing the issue, the parties agree. (*See* Defs.' Suppl. Br. (Doc. 54) at 4; Pls.' Suppl. Br. (Doc. 55) at 4.)

A case arises in a new *Bivens* context if "[it] is different in a meaningful way from previous *Bivens* cases decided by [the Supreme] Court." *Abbasi*, 137 S. Ct. at 1859. In *Abbasi*, the Supreme Court provided a non-exhaustive list of considerations that might make a case meaningfully different, including:

> [T]he rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusions by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id.* at 1860.

The Supreme Court has provided a plaintiff with a *Bivens* remedy only three times. In *Bivens* itself, the Court permitted a damages remedy against federal officers who violated plaintiff's Fourth Amendment rights. 403 U.S. at 397. In *Davis v. Passman*, the Court extended a *Bivens* remedy to a plaintiff who sued a Congressman for gender discrimination in violation of her Fifth Amendment rights. 442 U.S. 228, 248-49 (1979). And in *Carlson*, the Court approved of an implied damages remedy under the Eighth

Amendment. 446 U.S. at 19. This case meaningfully differs from Bivens, Davis, and Carlson.

Plaintiffs allege that the Individual Defendants violated Minor Plaintiffs' substantive due process rights under the Fifth Amendment. (E.g., Am. Compl. (Doc. 39) ¶¶ 358-69.) In Davis, the Supreme Court recognized an implied cause of action against a federal official for his violation of a plaintiff's Fifth Amendment right. 442 U.S. at 248-49. But "Bivens actions are not recognized Amendment by Amendment in a wholesale fashion." Wilson v. Libby, 498 F. Supp. 2d 74, 86 (D.D.C. 2007), aff'd, 535 F.3d 697 (D.C. Cir. 2008). Instead, Bivens actions "are context-specific." Id.; see also F.D.I.C. v. Meyer, 510 U.S. 471, 484 n.9 (1994) ("[A] Bivens action alleging a violation of the Due Process Clause of the Fifth Amendment may be appropriate in some contexts, but not in others.").

In Davis, the Supreme Court extended a Bivens remedy to a plaintiff where a federal official violated her rights under the equal protection component of the Fifth Amendment. Davis, 442 U.S. at 248-49; see generally Butts v. Martin, 877 F.3d 571, 590 (5th Cir. 2017) (citing Bolling v. Sharpe, 347 U.S. 497, 499 (1954); quoting United States v. Windsor, 570 U.S. 744, 774 (2013)) (explaining that the Fifth Amendment does not contain an equal protection clause but that "the Fifth Amendment's Due

Process clause contains within it the prohibition against denying any person the equal protection of the laws"). The Supreme Court has not extended a Bivens remedy to an alleged substantive or procedural due process violation of the Fifth Amendment by a federal official. See Lanuza v. Love, 899 F.3d 1019, 1026 (9th Cir. 2018) (citing Abbasi, 137 S. Ct. at 1860-64) ("While the Supreme Court has not extended Bivens to a case involving the substantive and procedural clauses of the Fifth Amendment, Abbasi did not preclude the possibility of such an extension.").[23]

The Fourth Circuit, in Loe v. Armistead, extended a Bivens remedy at the motion to dismiss stage against federal officials who deliberately denied plaintiff adequate medical care in violation of his due process rights under the Fifth Amendment. 582 F.2d 1291, 1294-96 (4th Cir. 1978), cert. denied, 446 U.S. 928 (1980). The Fourth Circuit, however, construed what was

_____

[23] In Abbasi, the Supreme Court found that petitioner's prisoner abuse claim under the Fifth Amendment's substantive due process component sought to extend Carlson, and derivatively, Bivens, to a new context. 137 S. Ct. at 1864. The Supreme Court vacated the lower court's decision and then remanded for an analysis of any special factors counselling hesitation. Id. at 1865. On remand, the magistrate judge recommended that the claims against the individual defendants be dismissed because the FTCA provided plaintiffs with a sufficient alternative remedy, precluding a Bivens remedy. Turkmen v. Ashcroft, No. 02-CV-2307 (DLI)(SMG), 2018 WL 4026734, at *12-13 (E.D.N.Y. Aug. 13, 2018) (Gold, Mag. J.) (report and recommendation not yet adopted). The case is still pending.

brought as an Eighth Amendment claim as a Fifth Amendment due process claim because plaintiff was not a prisoner under a judgment of conviction. Id. at 1293-94. In fact, in Carlson, where the Supreme Court granted a Bivens remedy for an Eighth Amendment violation, the Court noted that "another petition for certiorari being held pending disposition of this case," i.e., Loe, warranted the court addressing whether a remedy was available directly under the Constitution despite the availability of the FTCA. Carlson, 446 U.S. at 16-17 & n.2 (citing Loe, 582 F.3d at 1291).

The Fourth Circuit decided Loe decades before the Supreme Court decided Abbasi, again admonishing lower courts to exercise restraint in extending Bivens remedies beyond contexts in which the Supreme Court had done so. Also, the facts and rights at issue in Loe more closely resemble those in Carlson than those here. Thus, this court has little trouble finding that this case arises in a new Bivens context based solely on the meaningful difference of the constitutional right at issue here, see Abbasi, 137 S. Ct. at 1860, that is, the Fifth Amendment substantive due process right to attend elementary school free of sexual abuse.

## 2.  Special Factors Counselling Hesitation

Turning to step two under the Supreme Court's framework in Abbasi, this case involves several special factors counselling hesitation. Cumulatively, those special factors cause this court not to extend a Bivens remedy to Plaintiffs.

To be a "special factor counselling hesitation," a factor need only cause a court to hesitate before answering "whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits" of extending a Bivens remedy. See Abbasi, 137 S. Ct. at 1858. Though the Supreme Court has not exhaustively enumerated special factors counselling hesitation, "two are particularly weighty: the existence of an alternative remedial structure and separation-of-powers principles." Bistrian v. Levi, 912 F.3d 79, 90 (3d Cir. 2018) (citing Abbasi, 137 S. Ct. at 1857-58). Other special factors relevant here include: "whether Congress has already acted in th[is] arena, suggesting it does not 'want the Judiciary to interfere'; whether a claim addresses individual conduct or a broader policy question; whether litigation would intrude on the function of other branches of government; and whether national security is at stake." Id. (quoting Abbasi, at 1856-63). This court proceeds with these principles in mind.

## (a) **Alternative Remedies**

The existence of an alternative remedial structure capable of protecting the constitutional rights at stake can alone preclude a court from authorizing a Bivens remedy in a new context. See Abbasi, 137 S. Ct. at 1858; Liff, 881 F.3d at 918. Alternative remedies "can take many forms, including administrative, statutory, equitable, and state law remedies." Vega v. United States, 881 F.3d 1146, 1154 (9th Cir. 2018). An available remedial process need not provide complete relief, it need only be adequate to vindicate the violation of the right at issue in order to preclude a Bivens remedy. See Dunbar Corp. v. Lindsey, 905 F.2d 754, 762 (4th Cir. 1990).

Here, there are other remedies available to Plaintiffs. But this court does not find them sufficiently capable of protecting the Minor Plaintiffs' constitutional rights to alone preclude this Bivens action.

The FTCA, including the related administrative remedies that must be exhausted thereunder, is the most apparent alternative remedial avenue. Paradoxically, the Individual Defendants argue that the FTCA itself might not be a sufficient alternative remedy, (Defs.' Suppl. Br. (Doc. 54) at 6), and Plaintiffs have essentially conceded that the viability of their Bivens claims is dependent on their FTCA action being dismissed.

(See Pls.' Br. (Doc. 55) at 2 ("[T]he Bivens action should be allowed to proceed if the Court dismisses the FTCA action . . . .").) This court, however, does not find that the FTCA precludes a Bivens remedy on its own, which, in turn, means that the administrative remedies required to be exhausted under the FTCA are not sufficient alternative remedies.

As they were required to, Plaintiffs attempted to avail themselves of the FTCA-related administrative remedies. See 28 U.S.C. §§ 2401(b), 2675(a); (Am. Compl. (Doc. 39) ¶ 19). Plaintiffs allege that they "presented their claims to the Office of the Staff Judge Advocate for administrative settlement" and received no "substantive response." (Am. Compl. (Doc. 39) ¶ 19.) Taking the allegation in the Complaint as true, the available administrative remedies were not adequate. This is not a case where administrative claims with a federal agency led to a settlement offer. See Doe v. Meron, Civil Action No. PX-17-812, 2018 WL 3619538, at *13 (D. Md. July 30, 2018), appeal filed, No. 18-2024 (4th Cir. Sept. 5, 2018). And this is not a case where administrative remedies otherwise provided relief. See Goree v. Serio, 735 F. App'x 894, 895 (7th Cir. 2018) (finding administrative remedies that had in fact provided relief in the form of expungement of a disciplinary report

related to the same conduct underlying the lawsuit were in part sufficient to preclude a Bivens remedy).

As to the FTCA itself, the Supreme Court wrote in Carlson that it was "crystal clear that Congress views FTCA and Bivens as parallel, complementary causes of action . . . ." 446 U.S. at 19-20. Following the Supreme Court's decision in Abbasi, however, some courts have found that the availability of an FTCA claim precludes a related Bivens claim. For example, on remand in Abbasi, the magistrate judge found that the FTCA was an adequate alternative remedy to vindicate the constitutional wrong at issue there. Turkmen, 2018 WL 4026734, at *9-*11. The magistrate judge found that the Supreme Court in Abbasi took "a far broader view of those alternative remedies that foreclose assertion of a claim under Bivens." Turkmen, 2018 WL 4026734, at *10 (comparing Carlson, 446 U.S. at 18-19 (finding Bivens claims precluded "when defendants show that Congress has provided an alternative remedy which it explicitly declared to be a substitute for recovery directly under the Constitution and viewed as equally effective"), with Abbasi, 137 S. Ct. at 1858 (emphasis added) ("[I]f Congress has created any alternative, existing process for protecting the injured party's interest that itself may" preclude a Bivens remedy)). In this circuit, district courts have disagreed on whether the availability of an

FTCA action precludes a _Bivens_ remedy following the Supreme

Court's decision in _Abbasi_. Compare _Linlor v. Polson_, 263 F.

Supp. 3d 613, 621 (E.D. Va. 2017) (citations omitted) ("[T]he

Supreme Court has squarely held that the FTCA does not provide

an alternative remedial process bearing on the availability of a

_Bivens_ remedy."), with _Johnson v. Roberts_, C/A No. 3:17-3017-

JFA-SVH, 2018 WL 6363921, at *5 (D.S.C. Oct. 17, 2018), _report

and recommendation adopted_, C/A No. 3:17-3017-JFA-SVH, 2018 WL

6344136 (D.S.C. Dec. 5, 2018) (finding a _Bivens_ claim precluded

because the FTCA is a sufficient alternative remedy to "address

claims against the United States for personal injuries caused by

government employees acting within the scope of their

employment"); _compare also_ _Lineberry v. Johnson_, Civil Action

No. 5:17-04124, 2018 WL 4232907, at *10 (S.D. W. Va. Aug. 10,

2018), _report and recommendation adopted sub nom._, _Lineberry v.

United States_, CIVIL ACTION NO. 5:17-CV-04124, 2018 WL 4224458

(S.D. W. Va. Sept. 5, 2018) (finding "that the FTCA and state

tort law" were not appropriate alternative remedies for

plaintiff's constitutional claims), with _Clemmons v. United

States_, Case No. 0:16-cv-1305-DCC, 2018 WL 4959093, at *3-*4

(D.S.C. Oct. 15, 2018) (noting alternative remedies of the

Federal Bureau of Prisons' administrative grievance process and

the FTCA in a case involving denial of access to courts under

the First Amendment). This court does not find that the Supreme Court took such a broad view in Abbasi of those alternative remedies precluding a Bivens action. Because the availability of the FTCA (or alternative remedies generally) is not determinative of Plaintiffs' Bivens claims surviving, a quick summary will suffice.

First, the Supreme Court in Abbasi did not overrule any of its precedent, which has consistently held or reiterated that the FTCA is not an alternative remedy precluding Bivens claims, as the Third Circuit recently reiterated in a post-Abbasi case. See Bistrian, 912 F.3d at 92 (quoting Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 68 (2001); Carlson, 446 U.S. at 21; citing Bush v. Lucas, 462 U.S. 367, 378 (1983)) ("[T]he existence of an FTCA remedy does not foreclose an analogous remedy under Bivens. According to the Supreme Court, it is 'crystal clear that congress intended the FTCA and Bivens to serve as parallel and complementary sources of liability.'"); see also, Wilkie v. Robbins, 551 U.S. 537, 553-55 (2007) (quoting Carlson, 446 U.S. at 19-20) (noting the Court's holding in Carlson that the "FTCA and Bivens remedies were 'parallel, complementary causes of action' and that the availability of the former did not preempt the latter"). If the Supreme Court wanted to overrule its earlier precedent in Abbasi, it would have done so explicitly.

Second, Bivens and FTCA actions vindicate different wrongs. Bivens remedies vindicate violations of constitutional rights by federal employees. See Bivens, 403 U.S. at 395-97. On the other hand, federal constitutional violations are not necessarily cognizable under the FTCA, which allows suit against the United States in cases arising out of federal employees' negligence. See Meyer, 510 U.S. at 477 (describing that the source of liability under the FTCA is the law of the relevant state; concluding that a "constitutional tort claim is not 'cognizable' under § 1346(b)"); cf. Rodriguez v. Swartz, 899 F.3d 719, 740 (9th Cir. 2018), petition for cert. filed, ____ U.S. ____, (U.S. Sept. 7, 2018) (No. 18-309) (discussing the FTCA's exception under 28 U.S.C. § 2679(b)(2)(A) for Bivens claims, ensuring that "federal officers cannot dodge liability for their own constitutional violations"). For similar reasons, though Plaintiffs might have been able to pursue state tort claims against Nevarez – he was presumably not acting within the scope of his employment and thus the Westfall Act's immunity would not preclude such a suit –. state tort actions are unable to vindicate an alleged constitutional violation of Plaintiffs' Fifth Amendment substantive due process rights.

The FTCA remains today an insufficient "protector of the citizens' constitutional rights . . . ." Carlson, 446 U.S. at

23. While certainly a special factor counselling hesitation, the existence of the FTCA as a remedial alternative does not alone compel this court to find that it precludes an extension of Bivens here.[24]

### (b)  Separation of Powers

This case presents significant separation-of-powers concerns. Most notably, there has been substantial legislative and executive activity in the child-abuse context, specifically involving the military.

### (i)  Legislative Action

---

[24] The court notes two additional alternative remedies without opining on the viability of either. First, as the Individual Defendants argue, Plaintiffs might have been able to pursue a claim under the Military Claims Act. (See Defs.' Suppl. Br. (Doc. 54) at 7.) In Meron, a district court recently found that the Military Claims Act "afforded Plaintiffs at least one comprehensive and adequate avenue for relief." 2018 WL 3619538, at *13 (citing 10 U.S.C. § 2733). Second, Plaintiffs might have pursued a claim against Nevarez himself under 18 U.S.C. § 2255, see infra at 89, for a violation of 18 U.S.C. § 2242, regarding sexual abuse "in the special maritime and territorial jurisdiction of the United States." See 18 U.S.C. § 7(3) (defining "special maritime and territorial jurisdiction of the United States" to include "[a]ny lands reserved or acquired for the use of the United States . . . or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort"); see also Smith v. Husband, 376 F. Supp. 2d 603, 613 (E.D. Va. 2005) (criminal conviction is not a prerequisite to an action under § 2255).

Relatedly, as to Plaintiffs' allegations regarding the insufficiency of the criminal investigation, as the court told the parties at oral argument, this court does not view criminal investigations as adequate alternative remedies in this context.

"[L]egislative action suggesting that Congress does not want a damages remedy is itself a factor counselling hesitation." Abbasi, 137 S. Ct. at 1865. Legislation without a standalone damages remedy, in contexts where the Supreme Court has previously allowed a Bivens remedy, can strongly suggest that Congress purposely chose not to extend a damages remedy to private plaintiffs in those contexts. See id.

In the absence of the Supreme Court previously extending a Bivens remedy to a plaintiff alleging sexual abuse at a federally-operated school, Congress obviously could not extend or preclude an existing Bivens remedy when it passed VACA in 1990 (and subsequently reauthorized it). See 34 U.S.C. § 20301 et seq. (The reporting statute at issue here is under VACA. See 34 U.S.C. § 20341.) But Congress presumably could have enacted a corresponding Bivens-type cause of action for private litigants when enacting VACA. Congress was likely aware of 42 U.S.C. § 1983 litigation involving sexual abuse in public schools when enacting and reauthorizing VACA. See, e.g., Doe v. Taylor Indep. Sch. Dist., 15 F.3d 443 (5th Cir. 1994); Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720 (3d Cir. 1989); Pesce v. J.

Sterling Morton High Sch., 830 F.2d 789, 790 (7th Cir. 1987).[25]
As the Individual Defendants point out, (see Defs.' Suppl. Br.
(Doc. 54) at 8), Congress chose to include a freestanding civil
damages remedy when first passing the Child Abuse Victims'
Rights Acts of 1986. See 18 U.S.C. § 2255. That damages statute,
18 U.S.C. § 2255, grants minor victims a cause of action for
certain sexual abuse, forced labor, transporting in minors, and
child pornography offenses. That Congress chose not to include a
damages remedy when passing VACA, four years later, weighs
against judicially creating an implied cause of action here.[26]

Further, the Individual Defendants persuasively argue that
"[b]oth Congress and the Executive Branch have been very active

---

[25] However, the court also weighs the history of § 1983
litigation involving student sexual abuse in favor of extending
a Bivens remedy here and in resolving any legislative ambiguity.
Cf. Mynor Abdiel TUN-COS v. Perrotte, Civil Action No. 1:17-cv-
943 (AJT/TCB), 2018 WL 3616863, at *8 (E.D. Va. Apr. 5, 2018)
("Congress's silence in this context does not reliably reflect
any congressional intent to preclude a Bivens damages remedy,
particularly given the long standing judicial recognition of a
Bivens remedy for the types of Fourth and Fifth Amendment claims
asserted in this case."); see also Pumphrey v. Coakley, CIVIL
ACTION NO. 5:15-cv-14430, 2018 WL 1359047, at *5 (S.D. W. Va.
Mar. 16, 2018) (assuming arguendo that the case presented a
Bivens expansion, "[t]hese claims of direct and specific
excessive force are frequently litigated and well-suited to
judicial consideration, even absent congressional action").

[26] This court notes that at least two other courts have
found that 34 U.S.C. § 20341 created no cause of action. See
Adams v. United States, No. 07-809C, 2008 WL 4725452, at *2
(Fed. Cl. Ct. July 16, 2008); Graham v. Rawley, Civil Action No.
14-6743, 2016 WL 7477756, at *4 (D.N.J. Dec. 29, 2016).

in the area of [child] abuse in the military [specifically]."
(Defs.' Suppl. Br. (Doc. 54) at 8-9.) The Complaint supports
this argument. In the Complaint, Plaintiffs allege that Congress
mandated that the DoD establish the FAP "to prevent and protect
against child sexual abuse and other kinds of abuse of children
of military personnel . . . ." (Am. Compl. (Doc. 39)
¶ 37.A.ii.); see 10 U.S.C. § 1058 (mandating that the Secretary
of Defense prescribe the definition of "domestic violence" for
purposes of § 1058 and other necessary regulations); see also 32
C.F.R. § 61.1 (establishing policy and assigning
responsibilities for addressing child abuse through the FAP
pursuant to, in part, 10 U.S.C. § 1058(b)). Plaintiffs cite
numerous DoD regulations in alleging that Defendants had a duty
to protect Plaintiffs from sexual abuse and to prevent, report,
investigate, and treat it. (Am. Compl. (Doc. 39) ¶ 37.)
Congress's concern in this area is obvious and, while the
seriousness of child sex abuse cannot be overstated, this
court's special-factors inquiry at the stage of deciding whether
or not to extend a Bivens remedy is not into the efficacy of
Congress's regulations and the Individual Defendants' compliance
with them. Rather, the existence of the copious regulations as
evidence of Congress's intent is the pertinent fact. As with
"any inquiry respecting the . . . intent of Congress . . .

[where] Congressional interest has been 'frequent and intense,'"
and Congress has chosen not to extend a damages remedy,
Congress's silence is relevant. Abbasi, 137 S. Ct. at 1862
(quoting Schweiker v. Chilicky, 487 U.S. 412, 425-26 (1988)).

In sum, Congress's active legislation in the specific area
of child abuse within the military, as well as the DoD's
creation of the FAP and promulgation of numerous regulations in
this context, are special factors counselling hesitation.

### (ii) The DoD Context

The DoD context of this case is the most significant
special factor counselling hesitation, as "[t]he need for
special regulations in relation to military discipline, and the
consequent need and justification for a special and exclusive
system of military justice, is too obvious to require extensive
discussion." Chappell v. Wallace, 462 U.S. 296, 300 (1983). In
addition, "[e]xtending Bivens to this context would likely also
lead to increased litigation and subject the [DoD] to the
burdens of discovery and the litigation process." Jangjoo v.
Sieg, 319 F. Supp. 3d 207, 217 (D.D.C. 2018). Further, as
discussed, the Complaint references an abundance of DoD
regulations, and this case might require this court to analyze
military policies and practices, "a province almost always
reserved for review, enforcement and adjudication through the

Legislative or Executive branches." Meron, 2018 WL 3619538, at
*11. Finally, litigation involving the workings of the DoD might
require court intrusion into not just a co-equal branch of
government, but one responsible for our national security and
sensitive information. See Abbasi, 137 S. Ct. at 1861 (quoting
Dep't of Navy v. Egan, 484 U.S. 518, 530 (1988)) ("'[C]ourts
traditionally have been reluctant to intrude upon the authority
of the Executive in military and national security affairs'
unless 'Congress specifically has provided otherwise.'"). In
Abbasi, the Supreme Court found that Congress had not provided
otherwise in the context of the detention policies at issue, see
137 S. Ct. at 1861, and here, Congress has not provided
otherwise in the context of child sexual abuse occurring on a
military base at a DoD-operated school.

Relatedly, "[t]he Supreme Court has never created or even
favorably mentioned the possibility of a non-statutory right of
action for damages against military personnel, and it has twice
held that it would be inappropriate to create such a claim for
damages." Vance v. Rumsfeld, 701 F.3d 193, 199 (7th Cir. 2012)
(citing Chappell, 462 U.S. at 296; United States v. Stanley, 483
U.S. 669 (1987)). Defendant Sicinski, a colonel in the United
States Army, is a high-ranking official in the United States
military and was the Fort Bragg Garrison Commander during the

relevant time. His rank is "a far cry from [either the] FBI line agents or prison guards" in Bivens and Carlson, respectively. See Meron 2018 WL 3619538, at *11.

But this court also finds this case's military context unique. The relevant alleged acts and omissions did occur on a United States military base, yet for the most part involve regulations and employees of the DoDEA, a civilian agency of the DoD. To some extent, this case does not present the same concerns generally associated with litigation involving our military. This is not an incident-to-service case, see Feres v. United States, 340 U.S. 135, 146 (1950), and does not involve "enlisted military personnel [seeking] a Bivens-type remedy against their superior officers," Chappell, 462 U.S. at 304. Plaintiffs' allegations do not involve sensitive issues of national security or the administration of a uniquely defense-orientated institution in the same manner as another case involving the DoD might. See Doe v. Hagenbeck, 870 F.3d 36, 49 (2d Cir. 2017) (declining to permit female cadet's Bivens claim against commanding officers at the United States Military Academy because "West Point is part of the [DoD and its] cadets are service members"). This case involves young children attending an elementary school operated by a civilian agency of the DoD.

Further, Plaintiffs do not seek to "alter[] an entity's policy." Abbasi, 137 S. Ct. at 1860. Their claims address individual conduct, and they seek "compensation for a past wrong, not prospective relief from considered agency action." Linlor, 263 F. Supp. 3d at 621; see Bistrian, 912 F.3d at 90 (citing Abbasi, 137 S. Ct. at 1856-63). Plaintiffs do not challenge the constitutionality or sufficiency of the DoD policies, merely the execution of them. Unlike the detention policy claims challenged in Abbasi, the claims here do not to the same degree "call into question the formulation and implementation of a general policy." 137 S. Ct. at 1860.

Nevertheless, this case presents several factors – most notably legislative action and the DoD context – that cause this court to hesitate before answering "whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing" a Bivens action to proceed. See Abbasi, 137 S. Ct. at 1858. On balance, those special factors counselling hesitation are better "committed to those who write the laws rather than those who interpret them." Id. at 1857 (citations and internal quotation marks omitted). Following the Supreme Court's most recent exhortation, this court is unable to extend a Bivens remedy here.

IV.  CONCLUSION

For the reasons set forth herein, **IT IS HEREBY ORDERED** that the Motion to Dismiss Plaintiffs' Amended Complaint filed by Defendant United States of America, (Doc. 40), is **GRANTED IN PART AND DENIED IN PART,** in that:

1.  The United States' Motion to Dismiss, (Doc. 40), is **GRANTED** as to Claims III and IV, and those claims are hereby **DISMISSED WITH PREJUDICE**; and

2.  The United States' Motion to Dismiss, (Doc. 40), is **GRANTED IN PART AND DENIED IN PART** as to Claims I and VI, in that the United States' Motion is **GRANTED** as to allegations preceding October 11, 2011, and those allegations in Claims I and VI are hereby **DISMISSED WITHOUT PREJUDICE**, and **DENIED** as to the Government's conduct beginning on October 11, 2011 and continuing thereafter; and

3.  The United States' Motion to Dismiss, (Doc. 40), is **GRANTED IN PART AND DENIED IN PART** as to Claim II, in that the United States' Motion is **GRANTED** as to Danny, Timmy, and Wyatt, and Claim II is hereby **DISMISSED WITHOUT PREJUDICE** as to those Minor Plaintiffs, and **DENIED** as to Adam and Robby, as further set forth herein; and

5.  The United States' Motion to Dismiss, (Doc. 40), is **GRANTED IN PART AND DENIED IN PART** as to Claim V, in that the

United States' Motion is **GRANTED** as to all Plaintiffs and all allegations that do not concern a failure to report, and Claim V is hereby **DISMISSED WITH PREJUDICE** to that extent, and **DENIED** to the extent that Claim V alleges negligence per se for the Government's failure to report suspected child abuse on or after October 11, 2011.

IT IS FURTHER ORDERED that the Individual Defendants' Motion to Dismiss, (Doc. 42), is **GRANTED**, and Claims VII-X are hereby **DISMISSED WITH PREJUDICE**.

IT IS FURTHER ORDERED that Defendants' Motion for a Stay, (Doc. 48), is **DENIED** as moot.

This the 27th day of March, 2019.

William L. Osteen, Jr.
United States District Judge